ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| North American Landscaping, Construction ) | ASBCA Nos. 60235, 60236 |
| and Dredge, Co., Inc. ) | 60237, 60238 |
| ) | |
| Under Contract No. W912WJ-14-C-0004 ) | |

APPEARANCE FOR THE APPELLANT: Joseph L. Katz, Esq.
Huddles Jones Sorteberg & Dachille, P.C.
Columbia, MD

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
Engineer Chief Trial Attorney
Theresa A. Negron, Esq.
Engineer Trial Attorney
U.S. Army Engineer District,
New England

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

North American Landscaping, Construction and Dredge, Co., Inc. (NALCO) contracted with the U.S. Army Corps of Engineers (COE) for maintenance dredging of the Scarborough River, Scarborough, Maine. NALCO claims the unpaid contract balance of $960,482.48 (ASBCA No. 60235); unabsorbed overhead in the amount of $108,868 (ASBCA No. 60236); differing site conditions in the amount of $507,914.19 (ASBCA No. 60237); and a time extension of 94 days (ASBCA No. 60238). We decide entitlement only. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The appeal is sustained in part and denied in part.

## FINDINGS OF FACT

*The Solicitation*

1. Sealed bid Solicitation No. W912WJ-13-B-0012, issued on 23 August 2013, invited bids for maintenance dredging of an eight-foot channel, a six-foot channel, and a six-foot anchorage on the Scarborough River, Scarborough, Maine (tr. 2/222; R4, tab 4b). Due to environmental restrictions dredging was only permitted from 1 November 2013 through 31 March 2014 (R4, tab 4b at 33, ¶ 1.2(b)). Dredging was to commence within 30 days of the Notice to Proceed (NTP) unless that fell within the "no dredge season" of 1 April 2013 through 31 October 2013 (*id.*).

2. The solicitation contained five contract line item numbers (CLINs). CLIN 0001 was a lump sum for Mobilization and Demobilization. CLINs 0002 through 0004 were for dredging in the three channels for stated estimated quantities at a unit price for each cubic yard of dredged material. CLIN 0005 was an option item for Derelict Mooring Removal and Disposal. Bidders were instructed to bid all items and that all the work would be awarded to one bidder. (R4, tab 4b at 4) There were no instructions concerning what costs were to be included in which CLINs.

3. The solicitation included Federal Acquisition Regulation (FAR) 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 4b at 25), and Defense FAR Supplement (DFARS) 252.236-7004, PAYMENT FOR MOBILIZATION AND DEMOBILIZATION (DEC 1991) (tr. 2/223; R4, tab 4b at 36, ¶ 1.9). This clause, in full text in the solicitation, reads:

> (a) The Government will pay all costs for the mobilization and demobilization of all of the Contractor's plant and equipment at the contract lump sum price for this item.
>
> (1) Sixty percent of the lump sum price upon completion of the contractor's mobilization at the work site.
>
> (2) The remaining 40 percent upon completion of demobilization.
>
> (b) The Contracting Officer may require the Contractor to furnish cost data to justify this portion of the bid if the Contracting Officer believes that the percentages in paragraphs a(1) and (2) of this clause do not bear a reasonable relation to the cost of the work in this contract.
>
> (1) Failure to justify such price to the satisfaction of the Contracting Officer will result in payment, as determined by the Contracting Officer, of—
>
> (i) Actual mobilization costs at completion of mobilization;
>
> (ii) Actual demobilization costs at completion of demobilization; and
>
> (iii) The remainder of this item in the final payment under this contract.

2

(2) The Contracting Officer's determination of the actual costs in paragraph b(1) of this clause is not subject to appeal.

(R4, tab 4b at 36, ¶ 1.9) Ms. Jessica Kidd was the contracting officer (CO) for NALCO's contract (tr. 2/220-21). CO Kidd testified that paragraph (b) allows the COE to pay "actual costs at the time of mobilization and demobilization and then make full payment for that line item at the end of the contract" (tr. 2/224).

4. The construction specifications for the project included section 35 20 23, "HYDRAULIC DREDGING" (R4, tab 4d at 160). Part 3, "EXECUTION," paragraph 3.6.2, Deposition in Disposal Sites, required that the dredged material be placed "at Western Beach at the Prouts Neck Country Club [PNCC] as shown on the contract drawings." "[D]redged material shall be transported to Western Beach by locating the pipeline on [PNCC] property at Ferry Rock and then along the beach face above the Mean High Water elevation to the discharge area." (R4, tab 4d at 166, 171) The western beach disposal area was shown on Drawing G-101. Ferry Rock was at the northern end of western beach and dredged material was to be placed north to south from Ferry Rock along the Western Beach. (R4, tab 4c, drawings G-101, -104) There is no indication on the disposal area drawing that a stone revetment[1] was to be built at the northern end of the western beach disposal area by PNCC (id.; tr. 2/103, 3/99). The 8-foot deep channel was to be completed first, "prior to the start of dredging of all other areas" (R4, tab 4d at 62, ¶ 1.1).

5. Specification section 35 20 23, Hydraulic Dredging, part 3, Execution, provides other details relating to dredging (R4, tab 4d at 160). Paragraph 3.4.3, Adjacent Property and Structures, required the contractor to "conduct the dredging operation such that it does not undermine, weaken or otherwise impair existing structures located in or near the areas to be dredged" (id. at 168). Paragraph 3.5.7, Safety of Structures and Utilities, likewise requires protection of "piers, bulkheads, revetments, and other structures and utilities lying on, under or adjacent to the site of the work" (id. at 170). The specification also requires construction of temporary seaward berms to "contain the maximum amount of dredged material as possible on the beach disposal area" (id., ¶ 3.6.1(d)), and the use of a "baffle at the pipe discharge to prevent erosion of the existing beach" (id., ¶ 3.6.4(b)).

*Site Visit*

6. The COE held a site visit on 4 September 2013. In addition to three COE representatives, representatives from Southwind Construction, the Town of Scarborough's harbormaster, and the president and general manager of Prouts Neck

---

[1] *See* finding 77, *infra,* for an explanation of what a revetment is.

Country Club attended. NALCO did not attend. (R4, tab 5a) There are no minutes or any other record of what was discussed during the site visit.

*Two Bidders Responded*

7. Bids were publicly opened on 23 September 2013. When the bids were opened they were recorded on an abstract of offers. (Tr. 2/225; R4, tab 8) The two offerors were NALCO and Village Dock (VD). The Independent Government Estimate (IGE) and bids were:

| | IGE | IGE | NALCO | NALCO | VD | VD |
|---|---|---|---|---|---|---|
| CLIN Description | Unit Price | Estimated Amount | Unit Price | Estimated Amount | Unit Price | Estimated Amount |
| Mobilization and Demobilization | LS | 701,770 | LS | 1,457,044 | LS | 1,500,000 |
| Dredging 8' channel First 39,900 CD | 19.34 | 771,666 | 2.50 | 99,750 | 14.30 | 570,570 |
| Over 39,900 CD | 19.34 | 427,414 | 1.40 | 30,940 | 14.30 | 316,030 |
| Dredging 6' channel First 8,100 CD | 24.49 | 198,369 | 2.50 | 20,250 | 14.30 | 115,830 |
| Over 8,100 CD | 24.49 | 210,614 | 1.40 | 12,040 | 14.30 | 122,980 |
| Dredging 6' anchorage First 25,700 CD | 13.51 | 347,207 | 2.50 | 64,250 | 14.30 | 367,510 |
| Over 25,700 | 13.51 | 133,749 | 1.40 | 13,860 | 14.30 | 141,570 |
| Derelict Mooring | 5,020 | 25,100 | 346 | 1,730 | 1,000 | 5,000 |
| Total | | $2,815,889 | | $1,699,864 | | $3,139,490 |

(R4, tab 8) According to the CO's final decision, NALCO's bid was "extremely low and required bid verification" (R4, tab 2 at 2, ¶ 1). CO Kidd asked NALCO to verify its bid (tr. 2/226). NALCO verified its bid by letter dated 26 September 2013 (tr. 2/228; R4, tab 11). After NALCO's bid verification, CO Kidd asked for a revised IGE (tr. 2/227). CO Kidd explained that because NALCO's bid was lower than the IGE, the COE engineers reviewed NALCO's bid and, talked to NALCO to understand how it planned to perform and as a result revised the IGE (tr. 2/226-27). The IGE was revised on 27 September 2013 to reduce CLIN 0001 Mobilization and Demobilization to

4

$341,630.00, reduce the unit prices for CLINs 0002 to 0004 for a total of $1,963,694[2] (R4, tab 67a at 4).

8. NALCO's bid included a printed form entitled "PLANT AND EQUIPMENT LIST" filled out by the bidders (R4, tab 6 at 6). NALCO listed a Grace Hydraulic (Ellicott) dredge with 12-inch discharge rated at 144,000 cubic yards per month and a 20-foot Honda 225 tugboat (*id.* at 6-7).

*The Protest*

9. On 26 September 2013, Village Dock filed a pre-award agency protest contending that NALCO's bid was "grossly unbalanced"[3] (tr. 2/231; R4, tab 12). In an undated "Report of the Contracting Officer" responding to the protest, CO Kidd presented a detailed factual analysis/legal analysis and stated the following:

> Therefore, even if NALCO's price for mobilization is enhanced and its apparent low bid is mathematically unbalanced, because the IFB's estimated quantities are reasonably accurate representations of the agency's anticipated actual dredging needs, NALCO's bid is not materially unbalanced as there is no reasonable basis for viewing the bid as representing other than the lowest cost to the government.
>
> Although the line items of the NALCO bid could be considered as unbalanced, the risk to the Government is marginal. The dredging industry regularly generates bids that are unbalanced, and common risk mitigation techniques are in place to limit risk to the Government including the use of performance bonds and payment of mobilization at cost with remaining funds in the mobilization/demobilization line item paid at project completion.

---

[2] The revised IGE included the certification "The undersigned certifies this Government Estimate (IGE) was prepared independently and prior to any knowledge of prime contractor pricing" (R4, tab 67a at 3). The copy in the record is unsigned, but the certification is clearly wrong.

[3] "Unbalanced," in this context means that the prices quoted for the mobilization/demobilization CLIN was proportionally too high, while the prices quoted for the actual dredging were too low.

(R4, tab 17 at 8-9, citations omitted). In her report responding to the protest, CO Kidd stated that the IGE was "adjusted" and it was determined that NALCO's price for mobilization was not "unreasonably overstated" (*id.* at 8). CO Kidd recommended that Village Dock's protest be dismissed.

*The COE Wants a Bigger Dredge*

10. By letter dated 18 October 2013 to NALCO, Ms. Winston-Vincuilla, chief, COE Contract Division, informed NALCO that its Ellicott 370 dredge proposed for the Scarborough Project "is not adequate for open-water dredging in rough northeast waters" and invited NALCO to submit a new dredge otherwise NALCO's bid would be rejected (tr. 2/233-34; R4, tab 13). Mr. Kim is president of NALCO (tr. 1/37). He based his bid on using the Ellicott 370 Dragon dredge NALCO owned and believed that NALCO could successfully meet the dredging requirement of 40,000 cubic yards per month with the 370 (tr. 1/41, 51-52, 76-77; R4, tab 4b at 33). On 22 October 2013 NALCO responded to the 18 October 2013 letter stating that they were confident their Ellicott 370 dredge could do the job, but offered to use an Ellicott 670 dredge (tr. 2/234; R4, tab 14 at 2). The CEO of Ellicott Dredges providing the dredge extended NALCO credit for the rental amount. It was a four-month minimum at $70,000 per month plus a $70,000 security deposit or $350,000. (Tr. 1/61-62) Mr. Kim intended to pay for the dredge rental when the COE paid NALCO for mobilization (tr. 1/62). NALCO rented the bigger 670 dredge[4] and purchased larger diameter pipe all for about four to five hundred thousand dollars (tr. 1/51-52). NALCO requested an additional $328,624 for the new dredge, but stated if that was not possible NALCO would be able to complete the project at the original stated bid price (*id.*). By letter dated 31 October 2013 the COE accepted the Ellicott 670 dredge but denied NALCO's request for an increase in its bid price due to the additional expense of the larger dredge (R4, tab 15 at 2). By letter dated 1 November 2013, NALCO confirmed that it would perform the contract with the larger dredge without an increase in its bid price (R4, tab 16). CO Kidd testified that before award the COE found that NALCO's Ellicott 370 dredge did not meet the requirements of the contract and gave NALCO the opportunity to withdraw their bid (tr. 2/255). She testified "So we did not require them to use the 670. We had the right, and we did refuse to allow them to use [the] 370." (*Id.*)

---

[4] On cross-examination Mr. Kim testified that NALCO had purchased the 670 dredge in June 2014 for $1,250,000 (tr. 1/155) but this is contrary to his other testimony and documents in the record. We conclude NALCO rented the 670 dredge.

6

*COE Denies the Protest*

11. On 22 November 2013, Ms. McAndrew, assistant chief counsel/division counsel adopted CO Kidd's recommendation and denied Village Dock's protest (tr. 2/231; R4, tab 19).

*COE Awards Contract to NALCO & Exercises DFARS 252.236-7004(b)*

12. After the protest was denied, the COE awarded Contract No. W912WJ-14-C-0004 to NALCO on 2 December 2013 in the amount of $1,698,134[5] (R4, tab 20). The COE did not increase NALCO's bid price for the larger 670 dredge. The contract included FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984). (R4, tab 20 at 10) The contract included DFARS 252.236-7004, PAYMENT FOR MOBILIZATION AND DEMOBILIZATION (DEC 1991), included in full text above (R4, tab 20 at 21, tab 21). In the award letter CO Kidd imposed DFARS 252.236-7004(b) and stated that NALCO was required to furnish cost data to justify the mobilization and demobilization bid price and that failure to justify the price to her satisfaction "will result in payment of actual mobilization costs at completion of mobilization; actual demobilization costs at completion of demobilization; and the remainder of this item in the final payment under this contract" (R4, tab 21 at 2).[6] The contract delivery date was 31 March 2014 the last day before the no-dredging period (R4, tab 20 at 8).

*Prouts Neck Country Club (PNCC) to Build New Stone Revetment*

13. Mr. Walsh is a COE project manager for NALCO's contract (tr. 3/45, 47). He testified that the COE did not find out that PNCC was building a stone revetment in the disposal area of the site until 3 December 2013,[7] one day after award to NALCO

---

[5] We do not know why this amount is slightly less that the bid amount of $1,699,864 (finding 7).

[6] According to a 27 January 2014 Memorandum for Record by Mr. Stearns, CO Kidd's decision to invoke paragraph (b) was based on a 21 October 2013 memo from Mr. Acone, chief of engineering/planning division, finding that NALCO's bid was unbalanced (R4, tab 127 at 140, ¶ 1).

[7] While we accept Mr. Walsh's testimony there is a potentially conflicting email from PNCC to Mr. Walsh sent on 3 December 2013. The email reads in part, "As you are aware, we are attempting to tie our wall reconstruction along the golf course fairly close to your dredging work." (R4, tab 104 at 71) Referring to the email, Mr. Walsh denied he knew about the revetment before contract award (tr. 3/52). Mr. Walsh also attended a 4 September 2013 site visit where the president and general manager of PNCC and Southwind Construction were present but there is no record of what was discussed (R4, tab 5a). We do not know what role Southwind played in the process.

(tr. 3/52, 65-66; R4, tab 104). He testified he was "not happy that Prouts Neck Country Club did not share that information" sooner (tr. 3/52). He testified that a "changed site condition like that is problematic after you've awarded" a contract (*id.*). There was also a pre-existing rock wall at the location where the revetment was built that is shown in a 2010 picture (tr. 3/53-54, 63-64; R4, tab 66 at 1). This pre-existing rock wall was covered with sand and not visible in 2013 (tr. 3/64-65). The pre-existing rock wall is shown in pictures 2 and 3 and the partially completed new revetment is shown in picture 3 (tr. 3/54; R4, tab 66 at 1-3).

*NALCO's Mobilization Costs*

14. By letter dated 5 December 2013, NALCO submitted its justification for its bid mobilization costs with supporting documents (R4, tab 22 at 2). The cost of renting the Ellicott 670 Dredge was $70,000/Month with a 4-month minimum and security deposit of $70,000 for a total of $350,000 was included (*id.*; tr. 1/62, 2/196). The mobilization costs were as follows:

| | |
|---|---|
| Transportation Costs: | $ 54,469.00 |
| Crane: | $ 12,200.00 |
| Dredge: | $280,000.00 |
| Pipe: | $167,726.00 |
| Housing: | $ 15,000.00 |
| Survey: | $162,500.00 |
| Bond/Insurance: | $100,000.00 |
| Miscellaneous/Emergency Funds: | $ 82,331.00 |
| Total: | $874,226.00 |

(R4, tab 22 at 2) The $874,226.00 was 60% of NALCO's bid for mobilization as authorized by DFARS 252.236-7004(a) (*id.*). The survey estimate was from a local survey company in the Scarborough area (*id.* at 3-4).

15. A preconstruction conference was held on 10 December 2013 between NALCO and the COE (R4, tab 23). The COE prepared a standard conference outline and also minutes of the meeting. In the Description of Work, NALCO was told to complete the dredging of the 8-foot deep channel before starting other areas. (*Id.* at 7) In the section Disposal of Dredged Materials, the COE directed that dredged material be placed at the western beach and the PNCC as shown on the drawings (*id.* at 25). The minutes did not indicate any discussion of a stone revetment being built by PNCC in the disposal area (*id.* at 34-35). Dredging was to be completed by 31 March 2014 because environmental restrictions limited dredging from 1 November 2013 through 31 March 2014 (*id.* at 11).

8

*Notice to Proceed (NTP)*

16. The NTP was emailed to NALCO on 12 December 2013 (app. supp. R4, tab 109 at 83). The email was distributed within the New England District of the COE (*id.* at 82-83). Mr. O'Donnell, COE, one of the email recipients, wrote, "Let the babysitting begin! What's the over/under on the dredge's first sinking?" (*Id.* at 82) Mr. Walsh responded, "If they sink, does that create a lot of work for the PM? Not really interested in that." COE administrative contracting office (ACO) Morocco (tr. 2/239) responded, "Lot of paperwork for the Resident." Mr. Stearns responded, "All I know is I'm not going to be the rep from USACE to be on the dredge once inclement weather hits." (App. supp. R4, tab 109 at 82) The record contains a copy of the NTP signed by Mr. Kim but unsigned by CO Kidd (R4, tab 25).

*NALCO Expresses Concern over the Revetment*

17. On 17 December 2013 a Coordination Meeting was held between NALCO, COE and PNCC. In attendance were, among others, Mr. Kim, Mr. Walsh, COE project engineer, Mr. Stearns, COE project manager, and Ms. Jackson, PNCC manager (app. supp. R4, tab 301). Minutes of the meeting indicate that Mr. Walsh directed NALCO to continue work regardless of the revetment (sea wall):

> Concerns were brought up with the sea wall that was planned for construction along Western Beach.
> Mike Walsh stated that NALCO should continue to work as is, and not see any problems with this and that USACE would resolve this issue.
>
> Deborah Jackson stated that the work could not halt due to the high demand of the project. Prout's Neck Country Club was anticipating for the sea wall to be completed before March.

(*Id.* at 795) Mr. Kim recalls stating during the meeting that the revetment was not identified in the contract (tr. 1/150-51). There was no indication on the drawings that a revetment was going to be built on the disposal area (tr. 1/47-48, 52-53). Mr. Kim recalls after that comment he was told the COE had other business with the country club and that he could leave the meeting which he did (tr. 1/151-52). He was not given any information on the details on the revetment (tr. 1/165).

18. By email dated 13 January 2014 to NALCO, CO Kidd acknowledged receipt of NALCO's 5 December 2013 letter about mobilization costs. In it CO Kidd stated that the matter of mobilization costs was discussed during the pre-construction

9

conference and that NALCO had to submit actual costs once mobilization was complete. (R4, tab 26 at 2)

19. Also on 13 January 2014, Mr. Stearns sent an email to NALCO, copy furnished to CO Kidd and ACO Morocco, concerning, among other things, PNCC's "revetment reconstruction work at an area within NALCO's disposal operation." PNCC asked that NALCO stockpile sand 50 feet away from the location of the revetment work. (App. supp. R4, tab 120)

20. On 14 January 2014 NALCO's new dredge was delivered to the site (app. supp. R4, tab 122). By emails dated 9 and 15 January 2014 from PNCC (Woods Hole Group) to Mr. Walsh, PNCC stated that the revetment work would interfere with the COE's dredging in its vicinity of the revetment and requested that the dredging contractor "stockpile the dredge sand" (app. supp. R4, tab 123 at 129-30). Mr. Walsh testified that he was concerned about work on the revetment interfering with NALCO's dredging operations (tr. 3/66-67). On 16 January 2014 Mr. Stearns forwarded the PNCC emails to ACO Morocco and wrote:

> This was what Woods Hole Group sent to Mike Walsh in regards to their revetment work in the same area where NALCO needs to dispose sand. It would make no sense for NALCO to agree to such terms but regardless, I guess I can still ask them to play nice.

(App. supp. R4, tab 123; tr. 1/58) Mr. Kim recalled telling Mr. Stearns that they cannot be building a revetment in the disposal area when NALCO was dredging and asked if the revetment could be built after the dredging was complete. According to Mr. Kim, Mr. Stearns said the COE didn't care if NALCO finished its work, they were just following procedures. (Tr. 1/59)

*COE Refuses to Pay NALCO's Mobilization Costs in its Bid*

21. On 22 January 2014 NALCO submitted an invoice for $874,226.40 which was 60% of NALCO's total mobilization costs of $1,457,044.00 in NALCO's bid as authorized by paragraph (a) (ex. A-12). CO Kidd testified that she did not believe the 60% of CLIN 0001 "bore a reasonable relation to the cost of the work in the contract, holistically" because the "line items were not balanced" and CLIN 0001 included costs that should have been CLINs 0002-0004 for dredged material quantities (tr. 2/298-300). She said "you can't even fuel a dredge for this work at the cost [$2.50] of the line item for the quantities" (tr. 2/299). She understood that the dredged quantity price of $2.50 would not compensate NALCO for the costs of the dredge, pipe, survey etc. and that NALCO had placed those costs in the CLIN 0001 Mobilization/Demobilization costs

10

(tr. 2/299-300). She testified that NALCO's mobilization cost was not out-of-line with the other bid but was a little bit more than the government estimate (tr. 2/300).

22. In a 22 January 2014 email to ACO Morocco, Mr. Stearns stated that NALCO had all of their "plant and material onsite" and were preparing to start dredging (app. supp. R4, tab 125 at 133). Mr. Stearns also wrote:

> The President of NALCO, Sung Man Kim, kept mentioning that NALCO is short on cash at the moment and they needed to be paid for mobilization. I told him in a separate e-mail today that NALCO needs to provide backup documentation to justify their mobilization and that 1) USACE could not provide advance payments since it's not part of the contract and 2) that I highly doubted USACE would pay for procurement costs of a new dredge.

(*Id.*) Also on 22 January 2014, Mr. Dolan, COE, sent an email to ACO Morocco, copy to CO Kidd and Mr. Walsh, stating:

> We had discussions about closely monitoring the contractor's performance and being quick with the letters to document non-performance. Obviously we will work with the contractor and hope he can perform, but if [he] can't we are going to aggressively administer the contract to protect the Government[']s rights under the contract. At this point, the company seems very willing to work with us...time will tell.

(App. supp. R4, tab 126 at 135)

23. By email dated 27 January 2014 to ACO Morocco and CO Kidd, Mr. Stearns wrote:

> I just got off the phone with Sung Man Kim of NALCO and he was not in a happy mood regarding our initial stance of what we feel are allowable costs for mobilization (See attached memo). He stated that if we gave him any less than the requested 60% of NALCO's mobilization/demobilization bid item (Totals $874,226.40), we would put NALCO in a position where they could not perform work and would go bankrupt. Even at the request of $874,226.40, he stated NALCO would still be in a bad

11

position since, as you can tell from my memo, all his costs
are tied into the purchase of new materials and equipment.

The attached memo gives good reasoning as to why we
feel only $100k in mobilization is currently justifiable but
if any [of] my positions are erroneous, I am willing to
recant on them. Of course, the final determination comes
from the Contracting Officer so ultimately whatever is
agreed to, I'll be happy to pay it.

(App. supp. R4, tab 127 at 138) The attached memo by Mr. Stearns, also dated
27 January 2014, stated that CO Kidd decided to allow only actual mobilization and
transportation costs because NALCO's bid was unbalanced (*id.* at 140). Mr. Stearns
disallowed all equipment costs (dredge, pipe, fusion machine, tractor, etc.) to arrive at
a payment of $101,102.70 (*id.* at 142).

*NALCO Notifies COE of Severe Cash Flow Problems Jeopardizing Performance*

24. On 28 January 2014 NALCO wrote a seven-page mobilization justification
memorandum expressing "major concerns" (R4, tab 27). NALCO informed the COE
that it was being "severely penalized" by the COE's position not to pay NALCO's bid
mobilization costs and that the result would be that NALCO would have difficulty
performing with the resultant negative cash flow (*id.* at 3, 5-8). NALCO stated "no
contractor can be reasonably expected to finish with a high probability of success and
low risk on a project of this magnitude with negative cash flow" (*id.* at 6). In all,
NALCO presented multiple supporting arguments:

1. NALCO's bid was not materially unbalanced.

2. The fact that CLIN 0001 was 86% of total price was due
to aggressive bidding strategy that benefited the
government.

3. NALCO's cash flow is being severely restricted as a
result of providing the COE a significant discount.

4. NALCO's proposed mobilization costs are reasonably
related to the absolute cost of the work.

5. Withholding mobilization costs provides multiple
disincentives to performance.

12

6. NALCO cannot be reasonable expected to complete the contract with such a high magnitude of negative cash flow.

(*Id.* at 2-6) NALCO requested a meeting on 29 January 2014 to discuss the memorandum and mobilization payment dispute. On 28 January 2014 NALCO's request and memorandum was distributed within the COE. Mr. Dolan, COE, commented by 28 January 2014 email, "Yikes...I know it is late in the day, but that made no sense to me. I will reread later, but seven pages of blablabla...it is not my fault because I didn't realize what I was doing when I signed the contract is not a legal defense" (app. supp. R4, tab 130 at 171). CO Kidd recalled meeting with NALCO to discuss these payment issues (tr. 2/246).

25. In response to NALCO's continued requests for more payments, CO Kidd sent NALCO a letter dated 30 January 2014 explaining her decision to exercise paragraph (b) of DFARS 252.236-7004 (tr. 2/247; R4, tab 28). CO Kidd would only allow the following mobilization costs:

- Crane $18,375.00
- Trucking Equipment $9,968.00
- Trucking Dredge $16,060.00
- Pipe Float Shipping $900.00
- Office Trailer $828.70
- Real Estate Rental $3,975.00
- Bond $50,996.00

(*Id.* at 2) The total amount approved was $101,102.70. This was the same breakdown of allowed mobilization costs in Mr. Stearn's 27 January 2014 memo (app. supp. R4, tab 127 at 142). Mr. Kim testified that NALCO expected to be paid approximately $800,000 for mobilization costs but was only paid about $100,000. This adversely impacted NALCO's ability to perform. (Tr. 1/68-69) CO Kidd stated that the remaining costs for mobilization in NALCO's bid "are not costs that may be attributed to mobilization" (R4, tab 28 at 2). She denied costs for the pipe, pipe float, fusion machine, Kubota RTV 900, work preparation (fuel/utilities) and the dredge as "not inherently associated with mobilization" (*id.* at 2-3; tr. 2/203). CO Kidd testified that including the cost of the equipment, i.e., dredge, pipe etc., in the mobilization costs did not make any sense to her (tr. 2/305). She believes that as a result she came up with the language "not inherently associated with mobilization" (tr. 2/304-05, 307). In the 30 January 2014 letter to NALCO, CO Kidd acknowledged NALCO's cash flow concerns:

Your letter dated 28 January 2014 also presented your concerns about your company's cash flow, based upon my decision to require you to justify the contract lump sum

13

price for mobilization. It is not the practice of the U.S. Army Corps of Engineers to counsel contractors on their cash flow concerns or provide financing to contractors who experience cash flow problems. Resources that provide financing are available to the general public and to small businesses. Your decision to pursue or not pursue these resources is your business decision.

(R4, tab 28 at 3) CO Kidd stated that NALCO was currently in default and threatened termination for default (*id.* at 3-4). CO Kidd also warned NALCO about the "serious consequences" of "unsatisfactory contractor performance ratings" on potential future business NALCO might seek (*id.* at 4).

26. CO Kidd recognized she had discretion to exercise paragraph (b) of DFARS 252.236-7004 or not (tr. 3/38). She agreed that NALCO would be paid all of the bid CLIN 0001 mobilization and demobilization costs that she initially disallowed at the end of the contract when final payment was made (tr. 3/40-41). CO Kidd testified that she had concerns about NALCO's ability to perform when she put off payment of the majority of the CLIN 0001 costs to the end of the contract even though she knew that NALCO needed the dredge and pipe to perform the contract (tr. 3/41). However, she exercised her discretion to follow paragraph (b) to limit risk to the government (tr. 3/41-42). She testified that if they paid for the dredge up front "there was no reason for the contractor to continue performance once they had the money because there is no money on the line items [for dredged material]" (tr. 3/42). She did what she did knowing that the $2.50 CY dredged material rate was not enough to put fuel in the dredge much less reimburse NALCO for the dredge, pipe and other equipment needed to perform (tr. 2/299, 3/43-44). During the hearing the Judge asked CO Kidd when NALCO would get money to perform:

> Q. So when was he going to get his money to perform?
>
> A. Well, he's, would, he would be financing. But his, the way that he structured his bid put him in that position --
>
> Q. Only because you exercised your discretion to do B rather than A. That's what put him in the position.
>
> A. I would argue that there was already a risk, and that's why we did B instead of A.

(Tr. 3/44)

14

27. The COE authorized payment of $101,102.70 for CLIN 0001 Mobilization Costs (R4, tab 29). CO Kidd told NALCO to resubmit the invoice for $101,102.70 which was the amount she was willing to pay for mobilization costs (tr. 2/201; R4, tab 29). Since the COE would not pay for the mobilization costs as bid by NALCO, it did not have the money to pay for the survey. That is why, according to Mr. Paul Kim, NALCO's vice president, NALCO did not have survey support for the contract. (Tr. 2/198)

*NALCO Starts Dredging*

28. The revetment was completed by 7 February 2014 (tr. 3/52-53). NALCO started dredging on 10 February 2014 (R4, tab 72 at 47). Mr. Kim testified that the revetment was a "big problem" because the dredging material could undermine the wall and cause it to collapse. NALCO had to protect the revetment and could only work at low tide in the vicinity of the revetment. (Tr. 1/47-50, 52-53; R4, tab 4c at 3, 7) It wasn't until the end of March that NALCO passed the revetment portion of the disposal area (tr. 1/50). Mr. Paul Kim is the vice president of NALCO and was the dredge operator (tr. 2/195). Mr. Paul Kim testified there were a "large degree of stop and starts of the dredge" on this project. NALCO had a "watcher" on the beach who was in constant communication with the dredge. When there was too much water getting close to the revetment (wall) they would stop the dredge. (Tr. 2/195) Stopping a dredge is not a simple matter because the operator must first clean out the discharge pipe (tr. 2/195-96).

29. On 18 February 2014 ACO Morocco sent a letter to NALCO stating that after one week of work NALCO's production/dredging rate was only about 100 CY. Since only 41 dredge days remained until the cut-off date of 31 March 2014, ACO Morocco requested that NALCO submit a production plan indicating how it would complete the project. (R4, tab 30) NALCO responded by letter also on 18 February 2014 stating that weather prevented more dredging during the first week and that it would implement 24 hour work days to remedy the issue (R4, tab 31). ACO Morocco responded on 20 February 2014 acknowledging the bad weather during the first week of dredging and asking NALCO to "elaborate on NALCO's original responses from the letter dated 18-FEB-2014." ACO Morocco threatened to issue a cure notice "unless we see immediate corrective action." (R4, tab 32) Mr. Kim "responded verbally' stating that he did not have time to respond to letters due to the need to oversee dredging operations (R4, tab 34).

30. NALCO submitted another invoice on 23 February 2014 for $22,188.82 for additional mobilization costs which the COE agreed to pay (tr. 2/202; R4, tab 33).

15

31. Mr. Walsh recalls that he received a 24 February 2014 email from Ms. Jackson, PNCC, complaining that NALCO's discharge was causing excessive erosion on the beach in front of the revetment. A picture was included with the email. (Tr. 3/54; R4, tab 66 at 4) Mr. Walsh testified that there was "no protection required of a coastal revetment, except protect it against negligent operation, or the discharge end of the pipe" (tr. 3/75).

*NALCO's Financial Hardship*

32. Because the COE would not pay for the dredge and pipe as mobilization costs, Mr. Kim could not pay NALCO's bills and he was getting communications from collection companies. Mr. Kim decided to get a loan using his personal house and equipment as collateral. (Tr. 1/65-66) Mr. Kim also borrowed $100,000 from members of his church to make payroll (tr. 1/68-69). Mr. Kim eventually lost his house, equipment and his business to creditors (tr. 1/65-66).

*COE Issues Cure Notice*

33. On 28 February 2014 CO Kidd issued a cure notice due to "low dredging production." CO Kidd requested a written plan on how NALCO would cure the problem and suggested a termination for default might be issued if the situation was not cured. (R4, tab 34)

34. Mr. O'Connor was a project engineer on this project working with ACO Morocco (tr. 3/77-78). He took over from Mr. Stearns who left in February 2014 (tr. 3/78-79). When Mr. O'Connor first arrived Mr. Kim explained his cash flow problems and Mr. O'Connor felt something should be done to pay NALCO more for performance (tr. 3/101-02). In a 3 March 2014 email to ACO Morocco, subject Mob Payment for NALCO, Mr. O'Connor writes:

> Current scenario is the contractor completes 59% of the work but we pay him for only 15% of the contract amount until we settle the situation with his totally unbalance[d] bid?
>
> This does not seem fair to the contractor.

(App. supp. R4, tab 144 at 232) Mr. O'Connor's 6 March 2014 email to Mr. Walsh suggested that NALCO should be paid about $200,000 for performance (*id.* at 231). Mr. Walsh responded, "I am in favor of giving to NALCO whatever compensation you believe they are due. The sooner the better considering their cash-flow problems." (*Id.*)

16

35. By letter dated 4 March 2014 to CO Kidd, NALCO reiterated its argument that it should be paid its bid mobilization price because it had been paid only $123,291.52 of the $874,226.40 it claimed (R4, tab 35). NALCO explained its position that the dredge and pipe are properly part of mobilization costs. NALCO stated:

> Moreover, the Corps' refusal to pay NALCO for its mobilization expenses is presently seriously hindering NALCO's ability to implement a 24 hour work day in order to recover the project schedule. NALCO shall not be responsible for delays to the project scheduling caused by the referenced adverse weather as exacerbated by the Corps' position on the mobilization payment issue.

(*Id.* at 3-4) CO Kidd testified about this letter and stated that the cost of the dredge, pipe, etc., was not a mobilization cost because it was "not related to getting equipment to the site" (tr. 2/254). She testified that the cost for these items should be put in the price of the dredge quantity line item (tr. 2/254-55). CO Kidd replied to NALCO's 4 March 2014 letter on 7 March 2014 stating that NALCO had not submitted its plan to cure the deficiencies and suggested the contract would be terminated for default (R4, tab 36). NALCO responded on 9 March 2014 requesting a meeting and assuring the COE that it was committed to completing the contract (R4, tab 38). A series of correspondence ensued culminating with a 17 March 2014 COE letter informing NALCO that it would not be allowed to perform beyond 31 March 2014 and stating that if performance was not completed by that date a termination for default may be issued (R4, tabs 39-41). In a 24 March 2014 letter to NALCO, CO Kidd reiterated the COE's position that it would not consider any "interim payment requests from NALCO" and that work may not proceed past 31 March 2014 (R4, tab 43).

*Protecting the Revetment*

36. Contract specification section 35 20 23, Hydraulic Dredging, paragraph 3.5.7, Safety of Structures and Utilities, required NALCO to protect PNCC's new revetment (R4, tab 4d at 170). Mr. Kim testified that as of 7 March 2014 NALCO continued to protect the revetment from damage but as a result of the revetment NALCO had a very small work area that slowed down the dredging (tr. 1/79-80; app. supp. R4, tab 145). The need to protect the wall in the discharge area caused NALCO to stop pumping "[e]very day, every day, because if it's high tide we stopped" to prevent "digging underneath" the wall (tr. 1/100, 102). Mr. Kim testified, "If there were no wall, we would have been able to fly through the work" because they could just pump sand on the beach (tr. 1/80).

17

37. In an 11 March 2014 email to Mr. O'Connor and CO Kidd, ACO Morocco wrote:

> Jessica – please remember that the contractor is working odd hours and at the mercy of the tides while we have somebody 8 hours/day. The contractor has a lot of stop and start due to waiting for the tide, putting out pipe, then dredging if the tides allow. It was very inefficient.

(App. supp. R4, tab 152 at 259)

*COE Drafts Termination for Default*

38. In a 12 March 2014 email to ACO Morocco, CO Kidd wrote, "I'm drafting the T4D letter today for Counsel's review, and I'd like to send your completed report down with my letter, hopefully tomorrow? At this point, we're still on track for T4D Friday." (App. supp. R4, tab 154 at 282) Also on 12 March 2014 Ms. Cameron, COE, emailed CO Kidd a draft termination for default letter (app. supp. R4, tab 155).

*PNCC Needs Access to the Revetment*

39. By email dated 14 March 2014 to NALCO, Mr. O'Connor stated that PNCC needed to place sand over the revetment and would need an 18-foot access in front of the revetment to allow the equipment to get in to place the sand (tr. 3/86-87; R4, tab 47 at 7-8; app. supp. R4, tab 158 at 290-92). The work took three days, 21 to 23 March 2014 which caused NALCO to stop pumping (tr. 1/106-07, 3/73-74). Mr. Walsh testified that this was "absolutely" a change (tr. 3/74).

*NALCO Notified COE of Possible REA*

40. By letter dated 25 March 2014 to CO Kidd, Mr. Kim notified her that the revetment in the disposal area was interfering with NALCO's dredging and constituted a differing site condition (R4, tab 44). He explained that protection of the revetment required NALCO to maintain a second sand dike to direct flow of dredging discharge away from the revetment. Mr. Kim informed CO Kidd that NALCO "might make a request for an Equitable Adjustment." (*Id.*) Mr. Kim sent the letter because the COE wanted to close the project on 31 March 2014 (tr. 1/90). He believed that CO Kidd would give NALCO an extension so they could finish the job (tr. 1/91). CO Kidd did not give NALCO a time extension (*id.*).

41. By letter dated 25 March 2014 to CO Kidd, NALCO stated:

> The protection of the adjacent stone and sand bag walls
> constructed during the performance of our contract by the
> Prout's Neck Country Club, is a site condition that was not
> identified in the contract documents which has and
> continues to impact NALCO's time to perform its contract
> and its cost. NALCO believes this is a differing site
> condition within the parameters of the contract.
>
> The protection of the Country Club's structures requires
> NALCO to maintain a second sand dike to direct the flow
> of dredging discharge away from the structures which
> could neither be anticipated nor included in NALCO's bid.
> NALCO feels an Equitable Adjustment and a time
> extension is just and warranted as a result of the changed
> condition.

(R4, tab 44) CO Kidd agreed that the revetment built by the country club was not
specified in the contract (tr. 3/7). She testified, "clearly the revetment was not in the
contract specifications, that the impact of it was minimal" or "extremely minimal"
(tr. 3/10, 12-13). CO Kidd testified that it was NALCO's "incompetence" and
"mismanagement of the disposal" that caused problems, not the presence of the
revetment (tr. 3/16-17).

*NALCO Demobilizes*

42. Mr. Kim testified that by the end of March 2014 NALCO had moved
beyond the revetment in the disposal area (tr. 1/50). Mr. Kim asked CO Kidd for a
two-week extension based on the delay caused by the revetment. NALCO was not
given an extension and, on 31 March 2014, was told to remove the dredge and pipe
immediately or they would be terminated for default. NALCO removed all of the
equipment in two days. (Tr. 1/50-51, 94) NALCO was not paid for its mobilization
and demobilization and other costs (tr. 1/95).

43. In a 4 April 2014 internal COE email, Mr. O'Connor stated:

> Verbal Directions to NALCO on the beach:
> -       There were ongoing directions to protect the golf
> course's newly constructed stone wall from hydraulic
> pumping discharge.
> -       Last Friday 3-28-2014 told them in an on-site
> conversation to wrap up the dredging and concentrate on

19

grading the beach. Followed up with a couple of phone calls on Sat and Sun (3/29 & 3/30)[.]

(App. supp. R4, tab 189)

44. In another 4 April 2014 internal COE email, ACO Morocco stated that NALCO had removed all equipment and material from the beach (app. supp. R4, tab 191 at 389). In response, Mr. Walsh wrote, "I am not surprised. If nothing else NALCO has put their best foot forward and approached this project with integrity and a good faith effort to meet their obligations under this contract." (*Id.*) In a 7 April 2014 email Mr. O'Connor stated, "The unofficial COE survey shows NALCO['s] work was very good considering they had no survey work" (app. supp. R4, tab 192 at 392).

45. By email dated 9 April 2014 to CO Kidd and other COE personnel, Mr. Walsh provided a copy of the COE dredging survey (app. supp. R4, tab 201). The survey found that NALCO had dredged 16,078 cubic yards of required and over-depth material from the 8-foot entrance channel that was compensable under CLIN 0002AA. It found that NALCO removed an additional 8,704 cubic yards that was either outside the channel or over depth that was not compensable. (*Id.* at 445) Mr. Walsh explained:

> So they removed a total of 24,702 cubic yards from the river, but we would only pay for 16,078 of that volume. This is why we insist in the contract that the contractor have survey support. Otherwise they are dredging blind and can waste time and their own money dredging material we will not pay for.

(*Id.*)

46. By email dated 23 April 2014 from Mr. O'Connor to CO Kidd and other COE personnel, Mr. O'Connor reported the results of his review of NALCO' recent pay request for $929,623 (app. supp. R4, tab 204). He discussed "a lot of problems" with the pay request, but concluded that a final settlement might be $740,000 to $790,000 (*id.*). CO Kidd responded on the same day stating that his analysis was "spot on," but cautioned Mr. O'Connor to explain in writing why NALCO's request was rejected (*id.*).[8]

---

[8] There was no testimony about this email during the hearing.

20

*Photographs*

47. Dated photographs show the conditions in January, February and March 2014. Photo No. 3, 28 January 2014, show the partially-completed revetment and "sandbags" (R4, tab 66 at 3). Photo No. 4, 24 February 2014, shows dredging discharge and the lack of protection of the revetment and the relatively small discharge area between the revetment and the water (*id.* at 4). Photo Nos. 6 and 7, 6 March 2014, show the dredging discharge, protection of the revetment, and small discharge area (*id.* at 6-7). Photo No. 8, 15 March 2014, is an aerial photo showing the dredge and pipe ending at the revetment (*id.* at 8). Photo No. 9, 16 March 2014, shows dredging discharge in front of the protected revetment (*id.* at 9).

*Daily Reports*

48. The record includes NALCO's daily quality control reports from 27 December 2013 through 1 April 2014 (R4, tab 72) and COE's daily quality assurance reports from 21 January 2014 through 15 April 2014 (R4, tab 73). There was no testimony on these reports at the hearing. However, NALCO's reports are typewritten and identify delay caused by the revetment. The COE's reports are handwritten and not as detailed. NALCO reviewed its and the COE's daily reports. There were 156 hours of delays caused by the revetment documented in NALCO's reports (app. proposed findings of fact ¶ 163).[9] There were numerous days of weather delays documented on NALCO's daily reports.[10] The COE's daily reports were not as clear but did not contradict the entries in NALCO's daily reports (*id.* ¶¶ 164-65).

*Preparations for Settlement Negotiations*

49. Mr. Kim hired a local attorney, Mr. Giffune, to assist in settlement negotiations with CO Kidd (tr. 1/97). On 4 April 2014 Mr. Giffune sent CO Kidd a letter with a spreadsheet attached documenting on a daily basis impacts to the work caused by having to protect the revetment and weather issues (R4, tab 47). Mr. Kim recalled that Mr. Giffune reported that CO Kidd would not consider paying for the dredge rental, the new pipe and differing site condition (tr. 1/98). CO Kidd recalled a phone conversation with Mr. Giffune where they discussed the possibility of settlement as an alternative to termination for default (tr. 2/264-65).

50. Also on 4 April 2014 CO Kidd wrote NALCO to remind it that the performance period ended on 31 March 2014 and that NALCO must remove its equipment and materials from the area. She informed NALCO that if she decides to

---

[9] We verified the accuracy of NALCO's tally by looking at the entries on the reports.
[10] NALCO alleged 53 days of weather delay but we were only able to verify 27 days of critical delay (R4, tab 64 at 4-5; app. proposed findings of fact ¶ 209).

terminate the contract for default, NALCO would be responsible for excess re-procurement costs. (R4, tab 48) CO Kidd recalled discussions with NALCO's attorney over a no-cost settlement and that she was looking for a settlement proposal (tr. 2/266-67).

51. By email dated 25 April 2014 to Mr. Kim, CO Kidd stated:

> To clarify Mr. O'Connor's statement, labor and equipment costs for dredging are not currently payable. The terms of your contract allow for payment of a firm fixed price for the unit cost of dredged materials. We are only considering costs for your mobilization and demobilization line items because we invoked DFARS 252.236-7004 when we awarded this contract, which allows us to pay actual costs.
>
> Because you did not complete performance under the contract, we will need to determine how to conclude our business arrangement. At that time, the Government may consider all of the costs you incurred under the contract, including those related to labor and equipment for dredging. These costs cannot be considered now, however.

(App. supp. R4, tab 209 at 483)

52. By email dated 1 May 2014 to various COE employees, CO Kidd wrote:

> Yesterday Terry and I spoke to the attorney and surety for NALCO.
>
> -We spoke about NALCO's "pre-claim" statements and I let their lawyer know that I didn't find any claims to have merit....
>
> -We discussed the path forward for the contract. We've discussed these before, but to remind you the three options before us are:
> 1. T4D – Surety tenders payment for payment bond.
> 2. T4D – Surety takes over.
> 3. No-cost settlement as T4D alternative. I stressed the benefits of this to NALCO's attorney, and he plans to present this option to his client. It is my hope that we can

22

go down this path, but that depends on NALCO's willingness.

(App. supp. R4, tab 214) CO Kidd again told Mr. Kim's lawyer that she would not consider the dredge rental, pipe purchase, etc. or differing site condition (tr. 1/119, 172, 174).

53. By email dated 7 May 2014 to various COE employees, CO Kidd wrote:

Terry and I met again today with NALCO's counsel and surety. NALCO has agreed to pursue a no-cost settlement with us, which was our desired path forward. Please remember that, until the settlement is negotiated and finalized, NALCO could back out and we would still need to issue a T4D. Also please remember that money obligated on the contract remains obligated until it is deobligated, and any remaining funds won't be deobligated until after we settle.

(App. supp. R4, tab 218) Mr. Kim testified that at the time, he had no choice but to agree to what CO Kidd offered (tr. 1/118).

54. Bilateral Modification No. P00001, dated 7 May 2014 was issued to exercise "optional task 5 Derelict Mooring Removal and Disposal (5) times" for a total of $1,730.00 (R4, tab 49).

55. On 9 May 2014 Mr. O'Connor sent an email to ACO Morocco suggesting that a settlement cost would be around $616,000 (app. supp. R4, tab 220 at 509). Also on 9 May 2014 ACO Morocco sent an email to CO Kidd informing her of Mr. O'Connor's settlement estimate of "in the $600,000 range" (app. supp. R4, tab 221).

56. On 12 May 2014 NALCO submitted invoice No. 3 for $60,742.86 for mobilization and demobilization costs and $40,195 for dredged material for a total of $100,937.86 (tr. 2/207; ex. A-2). Mr. Kim sent an email to the COE inquiring about the payment of invoice No. 3 that had not been received (app. supp. R4, tab 225). Mr. Kim testified that the $60,742.86 in invoice No. 3 for demobilization costs was never paid (tr. 1/126, 2/207-08). The $40,195 may have been paid to the bonding company (tr. 2/206).

57. On 3 June 2014 Mr. O'Connor emailed Mr. Walsh stating that NALCO was still not paid the majority of their money for work completed (app. supp. R4, tab 227). By letter dated 5 June 2014 to NALCO, CO Kidd acknowledged that Modification No. P00002 authorized that NALCO's payment request for $41,925 be

23

paid to its surety, National American Insurance Co. CO Kidd also reminded NALCO that she was waiting for a settlement proposal. (R4, tab 50)

58. On 16 June 2014 NALCO's attorney submitted a settlement proposal in the amount of $1,023,898 that included costs for the dredge, pipe, miscellaneous equipment, payroll, overhead, demobilization, and differing site conditions (R4, tabs 53, 77). The proposal included the following:

> To date, NALCO has been paid a total of $165,216. By comparison, its expenses on this project are estimated at well in excess of $1,000,000. I cannot stress to you enough how severely this loss has impacted my client, its principals and employees. As you consider this proposal, be please [sic] mindful that NALCO is a small, family-owned business and that its survival may well depend on the resolution of this project.

(R4, tab 53 at 2) NALCO offered to settle the matter for $700,000 (*id.* at 5).

59. On 24 July 2014 a prenegotiation objective memorandum (POM) was signed by Mr. O'Connor, ACO Morocco and CO Kidd (R4, tab 76). The POM included an IGE of $348,508.18 as the amount owed to NALCO (*id.* at 3). Within the POM was an acknowledgement that "[t]here were difficulties in completing work in the area of Section A-A on sheet C-104 as called for in the contract. The combination of the privately owned structure [revetment] and narrow beach made performing contract work more difficult." (*Id.* at 8)

*The 1 August 2014 Meeting & Modification No. P00003*

60. Negotiations were held between NALCO and the COE on 1 August 2014 (tr. 2/269). CO Kidd testified, "I think that they [NALCO] knew that the alternative to coming to a negotiated agreement was to be terminated for default" and "the whole purpose of the negotiations was to come to a settlement so that, to avoid the situation where we would have to negotiate for default" (tr. 3/19). CO Kidd explained that she and "her team" believed termination for default was justified, "The revetment had very little to do with the failure; it was the mismanagement and incompetence, not only in the disposal, but also in the dredging itself" (tr. 3/20).

61. Mr. Kim recalled attending the 1 August 2014 meeting with CO Kidd. She offered $350,000. Mr. Kim and his lawyer left the meeting and went to a separate room. Mr. Kim told his lawyer he could not accept $350,000. The lawyer went back to the meeting and returned to Mr. Kim with an offer of $375,000. CO Kidd told his lawyer that $375,000 was take it or leave it and if NALCO did not take it she would

terminate the contract for default. (Tr. 1/129, 131-33, 169, 175) Mr. Kim understood that if the contract was terminated for default he would get no money and the bond company would auction off his personal house, property and NALCO's equipment (tr. 1/133). Mr. Kim decided to call a Small Business Administration (SBA) ombudsman. He talked to the ombudsman and told her he had a dilemma, either take $375,000 or face termination for default. (Tr. 1/133) According to Mr. Kim, the ombudsman told him that the COE was trying to force NALCO into bankruptcy and that if he didn't take the money offered he would lose his house. She suggested that he sign and could go to court and that a judge might help him. (Tr. 1/134) Mr. Kim went back into the meeting with CO Kidd and signed the offer (tr. 1/134-37). He testified it was a "take it or leave it" situation (tr. 1/176). CO Kidd sent Mr. Kim an email after the meeting instructing him how to request an "interim payment" of $374,000 with the final $1,000 at final payment and release of claims (app. supp. R4, tab 237).

*NALCO Complains About COE's Settlement Terms*

62. By email dated 5 August 2014 to "chysler@maine.rr.com,[11]" Mr. O'Connor stated "Settled on a price and NALCO will not be hit with a termination" (app. supp. R4, tab 238). By email dated 6 August 2014 to the COE inspector general (IG), NALCO asked for help. The email read in part:

> Eventually talks came to a No Cost Settlement which occurred last Friday (8/1/2014) and we felt almost forced to accept as we had various vendors that we needed to pay. Of the agreed upon settlement price ($375,000), there was $0 allocated to the dredge, $0 from the pipes, and $0 from the differing site condition which we believe was unfair. Also, payroll as well as equipment costs incurred during the dredging period were disallowed as well. They said they would be unable to justify any sort of payment for the dredge and pipe if they were audited in the future. From our understanding, the contracting officer believed that the differing site condition had no bearing on the project and rejected them completely.

(App. supp. R4, tab 240 at 1-2; tr. 1/140-41) The IG responded on 7 August 2014 stating that the IG could not help and referred NALCO to the disputes clause (app. supp. R4, tab 241). NALCO responded the same day stating in part, "We were just looking to receive a fair amount and we showed our costs which exceeded $1,000,000 on the project but requested $700,000 to have an amicable split but they completely blew off a few of our costs saying it was not payable" (*id.*). By email

---

[11] The identity of the person at this email address is not in the record.

dated 8 August 2014, NALCO sent the same 6 August 2014 text to Mr. Hazlett, COE director of contracting (app. supp. R4, tab 242; tr. 1/141). Mr. Hazlett responded on 11 August 2014 stating that his staff would look into the action and get back with NALCO (app. supp. R4, tab 243; tr. 1/141-42).

*Modification No. P00003*

63. A few days after the 1 August 2014 meeting, Mr. Kim received draft Modification No. P00003 in the mail incorporating the $375,000 settlement and deobligating the remaining $1,159,647.48. He received an email asking him to sign and return to CO Kidd. (Tr. 1/140) Mr. Kim signed Modification No. P00003 on 11 August 2014 and CO Kidd signed it on 12 August 2014 (R4, tab 54). He recalls there was a release, but he was so angry he just signed it to get the money (tr. 1/136-40). Mr. Kim testified that he signed the modification under protest and did not agree with its content (tr. 1/143). CO Kidd knew that Mr. Kim was not happy with the settlement agreement and had told her that he felt forced to enter into the settlement agreement (tr. 3/24-25).

64. Modification No. P00003 had release language in two places:

**SUMMARY OF CHANGES**

The Contractor understands and agrees that final payment of $375,000 will constitute compensation in full on behalf of the Contractor, its subcontractors and suppliers for all costs and markups directly or indirectly attributable to work performed under the Contract, including any modifications or changes attributable hereto. The Contractor will, by receipt of said payment for itself, its successors and assigns, remise, release and for[e]ver discharge the United States, its officers, agents, and employees of and from all liabilities, obligations, and claims whatsoever arising under or by virtue of said contract.

....

RELEASE – CONTRACTOR TO GOVERNMENT: This contract having been completed and finally accepted, the United States, its Officers and Agents are hereby released from all claims and demands whatsoever arising under or by virtue of said contract.

(R4, tab 54 at 3, 5)

26

65. In a 13 August 2014 email to NALCO, Mr. Kim's accountant recommended against a review of NALCO's finances at that time because the review would have to include the statement, "The Company is not a going concern" (ex. A-3).

66. On 13 August 2014 CO Kidd sent an internal email updating the recipients on the "Scarborough settlement." The email read in part:

> Also on Monday, NALCO sent an e-mail to Mr. Hazlett, the Director of Contracting for USACE. In the email, NALCO made many of the same allegations they've made before, including differing site conditions, lack of payment, etc. They also said they felt "forced" into a settlement because they had to pay their subs.

(App. supp. R4, tab 245 at 587; tr. 1/144-45)

*Mr. Hazlett Responds to NALCO*

67. On 15 August 2014 Mr. Hazlett responded to Mr. Kim's 8 August 2014 email with the following:

> The Corps of Engineers shares your disappointment that the time-sensitive dredging work could not be completed under the terms and conditions of the contract. However, having reviewed carefully the salient facts, it appears that our New England District not only acted in good faith at every step in awarding and administering this contract, but also took extra measures to limit financial damage to your company while acting within the bounds of the law and the best interests of the government. I am informed that a mutually acceptable resolution was achieved by both parties on August 1, 2014 at the New England District. At that meeting, NALCO agreed to accept a total of $375,000 as fair compensation to resolve any and all claims against the United States under this contract. All other value on the contract was to be de-obligated via bilateral modification. The contracting officer advises that in consultation with your attorney who was present, you chose to accept these terms. Accordingly, I see no basis for recommending that the contracting officer reconsider the settlement agreement. Please address further concerns

27

you may have regarding this contract to the responsible contracting officer.

(App. supp. R4, tab 249 at 601)

68. CO Kidd testified that Modification No. P00003 authorized NALCO to be paid $374,000 with the final $1,000 to be paid at final payment (tr. 2/279-80). NALCO was paid $374,000 on 26 August 2014 (tr. 1/137, 146; app. supp. R4, tab 250). The COE withheld $1,000. The $1,000 was paid about a year later in the summer of 2015 after NALCO filed its certified claim. (Tr. 1/146-47)

69. On 1 October 2014, Mr. Kim wrote Secretary of Defense Chuck Hagel asking him to "straighten out the situation" (tr. 1/137; app. supp. R4, tab 255 at 619). By letter dated 28 October 2014 to Mr. Kim, Mr. Hazlett, responding on behalf of Secretary of Defense Hagel, recounted many of the facts of interactions between NALCO and the New England District COE and included:

> Because the Corps elected to invoke DFARS clause 252.236-7004 and to pay actual mobilization costs, it was necessary for you to establish actual mobilization costs. You state that you had costs associated with mobilization that the Corps did not agree to pay. DFARS clause 252.236-7004(b)(2) states that the Contracting Officer's determination of the actual costs is not subject to appeal. Regulation does not define mobilization costs, but industry standards exist. In determining allowable mobilization costs, the Contracting Officer relied upon the input of the Construction Division of the New England District. The District's Administrative Contracting Officer worked very closely with you to identify any potential allowable costs that could be associated with mobilization. At your request, you also met with the Contracting Officer, Administrative Contracting Officer, and Chief of Construction to discuss allowable mobilization costs. The goal of the Corps in this matter was to provide you with the resources necessary to complete the project while limiting risk to the government. You were paid for those mobilization costs that were allowable and substantiated with documentation. Ultimately, the Contracting Officer's informed decision regarding which mobilization costs were allowable is final in accordance with DFARS clause 252.236-7004(b)(2).
>
> ....

28

I share your disappointment that the project was not completed in a timely manner. The Corps is committed to partnering with our small business community to meet our mission requirements. However, after review, it appears that our New England District acted in good faith in awarding and administrating this contract and also took extra measures to limit financial damage to your company while acting within the bounds of the law and the best interests of the government. Accordingly, there is no basis for reconsideration of the settlement agreement.

(App. supp. R4, tab 265 at 663-65) CO Kidd drafted this letter to NALCO signed by Mr. Hazlett on 28 October 2014 (tr. 3/36; app. supp. R4, tabs 259-60).

70. On 18 November 2014, Mr. Kim met with Mr. Hazlett and Ms. Fontana, associate director, COE Small Business Programs (app. supp. R4, tab 269). Mr. Hazlett told him his assistant would call to help him submit a certified claim (tr. 1/138-39).

*The Cashman Memo*

71. Mr. Cashman is the director of contracting for the COE New York District (tr. 2/5-6). Mr. Hazlett asked Mr. Cashman if he would be part of a team that would review the Scarborough dredging project (tr. 2/7). By email dated 8 December 2014 to Ms. Lee, COE attorney, Mr. Cashman wrote, "Lorraine - talking to the NAE KO - she said the settlement agreement was in lieu of a termination for default" (ex. A-5). Also on 8 December 2014, Mr. Cashman sent a memorandum to Mr. Hazlett presenting a detailed analysis of the NALCO dispute with the COE (app. supp. R4, tab 271). Mr. Cashman concluded with Recommendations that included the following:

> Due to the facts, that it appears from the contractor's understanding of modification P00003, there was not a meeting of the minds regarding this to be a final settlement—this review team recommends that both parties discuss this matter further. NAE should review any new REA. If the contractor can justify that they are entitled to additional compensation in addition to the agreed upon $375K, the Contracting Officer should work out a final bilateral modification with a release of claims for this contract.

(*Id.* at 690) Nothing happened as a result of this recommendation.

29

*COE Small Business Office Agrees with NALCO*

72. On 16 December 2014, Ms. Fontana, sent an email to various COE personnel including CO Kidd and COL Stoddard, Mr. Hazlett's Deputy (app. supp. R4, tab 277 at 718-19). Ms. Fontana wrote that the COE had treated NALCO improperly. She concluded that DFARS clause 252.236-7004 Mobilization and Demobilization was "misapplied" and the COE's refusal to pay NALCO the full amount of CLIN 0001 was unreasonable. She found the COE's denial of NALCO's request for equitable adjustment for "significant differing site conditions" was unreasonable. She also asserted that Modification No. P00003 was not valid due to the COE's "improper actions." She concluded the email with, "It is CESB's professional opinion and advisement that NALCO, is entitled to fair and reasonable treatment to include full payment (CLIN 0001 value $1.46M) for services already provided under CLIN 0001, mobilization/demobilization, as well as compensation for differing site conditions, at a minimum." She also stated that if the matter was not resolved "our office will proceed to advise NALCO to pursue the Claims process." (*Id.* at 719)

73. In a 22 December 2014 email to COL Stoddard, NALCO wrote the following:

> Just for clarification, of the agreed upon settlement price ($375,000), there was $0 allocated to the dredge, $0 for the pipes, and $0 for the differing site conditions (extra work) which we believe was unfair but they just would not consider any of those costs at all. There was also $0 of the costs incurred during the dredging period due to them excluding all costs during that work period. Also, we believe we should have received $1,498,969.00 from the firm-fixed-price contract based on the amount that was dredged but had only received $538,486.52.

> The **only** reason we accepted this settlement was due to various government agencies recommending that we do so in order to prevent bankruptcy as explained in the November 18[,] 2014 meeting with Mr. Hazlett and Ms. Fontana. We had spoken with the Congressman's office as well as the National Ombudsman which is where we had received the advice due to the financial damage we had received from the project. Also, we were told that we could receive additional compensation afterwards.

(App. supp. R4, tab 280 at 725)

30

*Final Payment*

74. By letter dated 23 January 2015 to NALCO, CO Kidd acknowledged that $1,000 remained unpaid and asked NALCO to fill out a form to "assist us in the closeout effort" (app. supp. R4, tab 297 at 788). CO Kidd recalled that the $1,000 was paid unilaterally because NALCO would not submit a final payment request (tr. 2/280; R4, tab 62).

*Certified Claim*

75. NALCO submitted a certified claim in the amount of $2,165,093.11 on 14 January 2015 (R4, tab 57). By letter dated 5 February 2015 to NALCO, the COE stated that the certification in NALCO's claim was not in accordance with the FAR's certification requirement (R4, tab 60). On 19 February 2015 NALCO submitted a properly certified claim (R4, tab 61). On 30 April 2015, NALCO submitted a supplemental certified claim for a 94-day time extension and rescission/repudiation of the settlement agreement (R4, tab 2 at 19).

76. On 2 July 2015 CO Kidd issued a final decision denying NALCO's claim (R4, tab 2 at 24). NALCO appealed the final decision to the Armed Services Board of Contract Appeals (ASBCA) and on 28 September 2015 the appeals were docketed as ASBCA Nos. 60235 Contract Balance, 60236 Unabsorbed Overhead, 60237 Differing Site Condition, and 60238 Time Extension (R4, tab 1).

*Expert Testimony & Reports*

*Mr. Carlos Pena*

77. Mr. Carlos Pena is a civil engineer with experience in dredging and waterfront engineering and works for CLE Engineering in Marion, Massachusetts (tr. 2/88). The Board accepted Mr. Pena as NALCO's expert in dredge construction and performance (tr. 2/92-93). Mr. Pena wrote an expert report wherein he listed the documents he reviewed and offered some opinions (ex. A-8). He learned that the golf course built a stone revetment which is a slanted sea wall that protects the landward side from erosion (tr. 2/95-96). The COE drawings for the original Scarborough project did not show the stone revetment constructed by the golf course (tr. 2/108-09, 3/99-100; R4, tab 4c, drawing C-104, section A-A). Drawings for the country club revetment, dated 24 June 2013, show a "probed wall 2011" and the new revetment seaward of the probed wall. Drawing note 1 states that an existing stone wall was constructed in the 1930's. The old wall influenced the location of the new revetment. Mr. Pena testified that the existence of the new stone revetment required NALCO to protect it from "scouring" that would undermine the revetment and cause it to collapse.

(Tr. 2/133-37) If the "jet" of the slurry were to hit the sand below the revetment it could erode the sand and the revetment would "fall apart" (tr. 3/204-05). The contract required NALCO to start pumping the dredged material on the country club's property where the new revetment was built (tr. 2/138-42; R4, tab 4c at 3, sheet G-101, tab 4d at 171).

78. Mr. Pena reviewed NALCO's records and found that it was less than 30% efficient and spent most of its time trying to protect the revetment (tr. 2/150). Once NALCO could move beyond the revetment it could "normalize operations and achieve a higher production rate" (tr. 2/151).

79. Mr. Pena discussed various pictures taken in February and March 2014 that showed the revetment and dredging discharge operations. The pictures show the access road NALCO provided to the country club and the protection berms used to protect the revetment. (Tr. 2/145-49; ex. A-11)

*Mr. Roger Bullock*

80. Mr. Roger Bullock is deputy chief of operations and chief of navigation, COE, Wilmington District of North Carolina (tr. 3/111). Mr. Bullock was accepted by the Board as an expert in dredging (tr. 3/120, 125). Mr. Bullock wrote an expert report dated 7 April 2017 (R4, tab 78).

81. In his expert report Mr. Bullock first reviewed the abstract of bids. He stated that "NALCO's bid presented warning signs as it was significantly lower than the independent government estimate (IGE). The contractor calculated excessive mobilization and minimal unit costs, particularly when compared to the IGE unit cost." (R4, tab 78 at 4) NALCO's CLIN 0002A unit cost was $2.50 compared to the IGE of $19.34 (*id.*, R4, tab 8). Mr. Bullock could not see how NALCO could operate the equipment and personnel at such a low price (*id.*).

82. Mr. Bullock reviewed the contract documents and opined that the COE's concern over NALCO's dredge was appropriate:

> It is my opinion that USACE presented an appropriate level of concern with respect to NALCO's bid and gave NALCO a prudent opportunity to improve its approach or withdraw due to clear indications that the contractor proposed inadequate equipment and showed inattentiveness to the level of effort required for success.

(R4, tab 78 at 5)

32

83. Mr. Bullock commented on NALCO's performance. He stated "NALCO did not achieve the production capability of the Ellicott 670 because NALCO did not alter its manning approach to account for the larger plant [dredge]." (R4, tab 78 at 6; tr. 3/145-48) Concerning placement of the dredged material, the pipeline route was along the mean high waterline and the discharge point depends on what the site looks like (tr. 3/150).

84. Mr. Bullock commented on the stone revetment. He stated, "The revetment was a known physical presence before and after bidding, which could have been noted by the Contractor had it conducted a site visit."[12] He acknowledged that the revetment was not on the plans and drawings. (R4, tab 78 at 8; tr. 3/152) Mr. Bullock did not believe that the revetment should impact NALCO's production (tr. 3/153). He opined that NALCO's problems with the revetment were the result of, "inattention to detail and housekeeping of the beach with constant contouring of the material as the project progressed, again indicated insufficient supervisory, workforce, technical knowledge, and/or management of the contract requirements" (id.).

## DECISION

*Preliminary Matter*

We want to make it clear that, although we refer to CO Kidd often in this decision, we do not intend to single her out. Her decisions were made collectively with the support of other COE personnel, "her team" (finding 60), as discussed herein. Responsibility for CO Kidd's actions and decisions are shared by all COE personnel involved.

*Pre-Award Interference*

We understand that the government's pre-award actions cannot violate the implied duty of good faith and fair dealing because the implied duty does not arise before the contract is awarded. *Tug Hill Construction, Inc.*, ASBCA No. 57825, 14-1 BCA ¶ 35,777 at 175,025 (Although every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, that duty does not deal with good faith in the formation of a contract.). We discuss the COE's pre-award actions because they are relevant to the COE's breach of the implied duty of good faith and fair dealing after award.

Bids were publicly opened on 23 September 2013 (finding 7). Three days later, on 26 September 2013, Village Dock, the only other bidder, filed a pre-award agency

---

[12] This statement is clearly incorrect. He may have confused the "probed wall" with the new revetment.

33

protest contending that NALCO's bid was "grossly unbalanced" (finding 9). It is obvious from the Abstract of Bids that NALCO's bid was in fact "grossly unbalanced," but it offered a really cheap price that appealed to the COE (finding 7). While the protest was pending the COE reviewed NALCO's bid. NALCO proposed to use an Ellicott 370 Dragon dredge that it owned (finding 10). On 18 October 2013 the COE informed NALCO that its 370 dredge was not acceptable and that NALCO had a choice to make, it could withdraw its bid or propose a larger dredge otherwise its bid would be rejected (*id.*). NALCO agreed to offer a larger dredge, the Ellicott 670, but had to rent it for the additional cost of $70,000 per month with a four-month minimum plus $70,000 security deposit. NALCO asked for an additional $328,624 to compensate it for the larger dredge. However, NALCO stated if it was not possible to increase its bid it would agree to complete the project at the original bid price. On 1 November 2013, NALCO confirmed that it would not withdraw its bid and would use a larger dredge, the Ellicott 670, at the original bid price. (*Id.*) The COE did not increase NALCO's bid price as NALCO requested (findings 10, 12). The COE also recalculated its IGE based on NALCO's bid in order to justify award to NALCO in violation of the certification printed on the IGE form (finding 7).

In responding to Village Dock's protest, CO Kidd concluded that NALCO's bid was mathematically unbalanced but not materially unbalanced because "there is no reasonable basis for viewing the bid as representing other than the lowest cost to the government" (finding 9). CO Kidd argued there was no risk to the government because the COE could pay for "mobilization at cost with remaining funds in the mobilization/demobilization line item paid at project completion" (*id.*). Village Dock's protest was denied on 22 November 2013 (finding 11). The COE awarded Contract No. W912WJ-14-C-0004 to NALCO on 2 December 2013 at the prices in NALCO's bid (finding 12). In the award letter CO Kidd imposed DFARS 252.236-7004(b) and stated that NALCO was required to furnish actual cost data to justify payments for mobilization and demobilization (*id.*).

CO Kidd testified that the COE had a right to refuse to accept NALCO's use of its 370 dredge or have its bid rejected (finding 10). Contrary to the COE's belief, it had no right to allow NALCO to amend its bid and offer a larger dredge in the middle of a sealed bid competition. FAR 14.404-2(e), Rejection of Individual Bids, does not allow the government to request bid changes that go to the substance of the bid or prejudice other bidders.[13] In this case the COE did both: it changed the substance of NALCO's bid and it prejudiced Village Dock. The COE had three alternatives after bid opening, (1) reject NALCO's bid as non-responsive because of the 370 dredge and

---

[13] FAR 14.404-2(e) reads in part, "A low bidder may be requested to delete objectionable conditions from a bid provided the conditions do not go to the substance, as distinguished from the form, of the bid, or work an injustice on other bidders."

award to Village Dock, (2) award to NALCO based on its original bid that proposed the 370 dredge, or (3) cancel the solicitation. Of course if the COE awarded the contract to Village Dock, it would have to pay substantially more. (Finding 7) It is clear to us that the COE violated FAR to get the low price offered by NALCO, but with the larger more expensive dredge at no additional cost. It was unfair and prejudicial to require NALCO to absorb the additional $350K for the larger dredge. It is also clear from CO Kidd's analysis of the protest that a significant justification for denying the protest was her plan to impose DFARS 252.236-7004(b) to limit mobilization "to cost" and defer payment of the remainder of the CLIN 0001 amount to the end of the contract. (Finding 9) The COE gave no thought to the effect of this plan on NALCO's cash flow. Therefore, before award, the COE improperly recalculated the IGE to support award to NALCO, improperly manipulated NALCO's bid to justify award at the lowest price, in so doing unfairly increased NALCO's cost of performance by requiring a larger dredge, and simultaneously planned to act to deprive NALCO of the cash flow it needed to perform the contract.

*Invoking DFARS 252.236-7004(b) was an Abuse of Discretion*

No one in the COE gave any critical thought to the language in DFARS 252.236-7004(b) that set forth the criteria that must be satisfied before CO Kidd had the right to impose paragraph (b) on NALCO. If they had, it should have become apparent that the language is ambiguous. This in turn requires a multi-step legal analysis to sort out the interpretation to be applied. That analysis is what we do in this decision.

Contract interpretation under the Contract Disputes Act (CDA) is a question of law. *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1368 (Fed. Cir. 2009).[14] DFARS 252.236-7004, Payment for Mobilization and Demobilization, provides initially:

> (a) The Government will pay all costs for the mobilization and demobilization of all of the Contractor's plant and equipment at the contract lump sum price for this item.
>
> (1) Sixty percent of the lump sum price upon completion of the contractor's mobilization at the work site.

---

[14] Appellant offered a contract interpretation analysis, in its reply brief, but it focused on the words "actual mobilization costs" rather than the prerequisite requirement needed to justify imposing paragraph (b) (app. reply br. at 5-7).

35

(2) The remaining 40 percent upon completion of demobilization.

(Finding 3) The lump sum price in this case is NALCO's CLIN 0001 price of $1,457,044 (finding 7). Under paragraph (a) NALCO would be entitled to be paid 60% of $1,457,044 or $874,226.00, (a)(1), for mobilization and 40% or $582,817.60, (a)(2), for demobilization of its "plant and equipment." There is no definition of "mobilization" in the contract. We interpret the fact that "plant" is listed separately from "equipment" to mean that "plant" is something different than equipment. There is no definition of "plant" in the contract. It is clear from NALCO's bid that it interpreted "mobilization" of its "plant and equipment" to allow for reimbursement for its equipment costs (dredge, pipe, etc.) which was required for performance. (Findings 7, 14) It is equally clear that CO Kidd interpreted "mobilization" of "plant and equipment" to be limited to transportation and other non-performance related costs (findings 23, 25). CO Kidd believed that recoupment of the equipment/performance costs should be in CLINs 0002 to 0004 unit prices for cubic yards of dredged material (finding 21). However, there is nothing in the solicitation informing bidders of this interpretation. It is equally clear CO Kidd knew that NALCO put its equipment/performance costs in CLIN 0001[15] because, she testified that CLINs 0002 to 0004 at $2.50 per CY was not enough to put fuel in the dredge (finding 26). She therefore knew that invoking DFARS 252.236-7004(b) would deprive NALCO of the funds it needed to perform.

DFARS 252.236-7004(b) gives the CO the discretion to impose an alternative method of payment for mobilization:

> (b) The Contracting Officer may require the Contractor to furnish cost data to justify this portion of the bid if the Contracting Officer believes that the percentages in paragraphs (a)(1) and (2) of this clause do not bear a reasonable relation to the cost of the work in this contract.
>
> (1) Failure to justify such price to the satisfaction of the Contracting Officer will result in payment, as determined by the Contracting Officer, of—
>
> (i) Actual mobilization costs at completion of mobilization;
>
> (ii) Actual demobilization costs at completion of demobilization; and

---

[15] Village Dock did the same thing because its CLIN 0001 price was $1.5M (finding 7).

(iii) The remainder of this item in the final
payment under this contract.

(2) The Contracting Officer's determination of the
actual costs in paragraph (b)(1) of this clause is not
subject to appeal.

(Finding 3) The use of the word "may" in the first sentence "presupposes" discretion. *Smart Way Transport Services*, ASBCA No. 60315, 16-1 BCA ¶ 36,569 at 178,110. This grant of discretion is limited by paragraph (b) and does not preclude the possibility that exercising paragraph (b) could be an abuse of discretion.[16]

We considered abuse of discretion recently in *Raytheon Co.*, ASBCA No. 57743 *et al.*, 17-1 BCA ¶ 36,724:

> In determining whether a CO's decision is arbitrary or capricious or an abuse of discretion we consider (1) whether there is evidence of subjective bad faith on the part of the CO; (2) whether the CO had a reasonable, contract-related basis for the decision; (3) the amount of discretion given to the CO; and (4) whether there was a proven violation of a statute or regulation. There is no need for each of the four factors to be present in order to establish arbitrary and capricious action by the CO. For example, proof of the fourth factor might be enough to show that the CO's conduct was arbitrary and capricious. However, the regulatory violation must have been prejudicial.

> The Board's scope of review of alleged arbitrary and capricious action is narrow and we are not to substitute our judgment for that of the agency. However, the agency must have examined the relevant data and be able to articulate a satisfactory explanation for its action, including a rational connection between the facts and the action.

*Id.* at 178,845 (citations omitted).

---

[16] The immunity from appeal in subparagraph (b)(2) applies only to the CO's determination of actual cost of mobilization/demobilization in subparagraph (b)(1), not the decision to impose paragraph (b).

We consider these four elements. There is no evidence of "subjective bad faith," element (1). Viewed in a vacuum, CO Kidd's decision to impose (b) to defend against the protest seems reasonable, element (2). The amount of CO Kidd's discretion, element (3), is limited by the test stated in (b). The optional method of payment in paragraph (b) may be imposed only if "the Contracting Officer believes that the percentages in paragraphs (a)(1) and (2) of this clause do not bear a reasonable relation to the cost of the work in this contract." The comparison required by (b) is to the "cost of the work in this contract." It does not say the actual cost of transportation of plant and equipment as CO Kidd interpreted the language. So the central question in interpreting this language is "what work"? It is apparent from NALCO's bid that it interpreted the "cost of the work in this contract" to mean the total cost of the contract. NALCO said as much in its 28 January 2014 Mobilization Justification Memorandum, "NALCO's proposed mobilization costs are reasonably related to the absolute cost of the work" (R4, tab 24 at 4), but the COE failed to appreciate the point. CO Kidd interpreted "work" to mean only the actual cost transportation costs, bond costs, etc. but not the cost of equipment needed to perform the work (finding 25).

Language is legally ambiguous if it is susceptible to two reasonable interpretations. *M.A. Mortenson Co.*, ASBCA No. 50383, 00-2 BCA ¶ 30,936 at 152,705 ("It is a settled legal principle that a contract or its terms are considered ambiguous only when susceptible to two different reasonable interpretations, each of which is consistent with the contract language.") (citations omitted). We think the most reasonable interpretation of "the cost of the work in this contract" is the total cost of work in the contract or the total price of CLINs 0001 to 0004 or $1,698,134[17] (finding 12). As stated above, "the percentages in paragraphs (a)(1) and (2)" are $874,226.40 and $582,817.60 respectively or $1,457,044.00. Applying the amounts as required by the language means that to exercise paragraph (b) CO Kidd must find that $1,457,044 does not bear a "reasonable relation" to the total price of $1,698,134. The clause provides no help in understanding what "reasonable relation" means. We see no reason why $1,457,044 does not bear a "reasonable relation" to $1,698,134 and, if correct, CO Kidd would not have had the discretion to invoke (b). However, we must also look at CO Kidd's interpretation to see if it is also reasonable. In determining reasonableness it is only necessary that the interpretation be in the "zone of reasonableness." *States Roofing*, 587 F.3d at 1369 ("A contractor's reasonable interpretation need not be the best interpretation. It need only be within the zone of reasonableness."). Therefore, we look closely at CO Kidd's interpretation of paragraph (b). CO Kidd testified that she did not believe the 60% of CLIN 0001 or $874,226.40 "bore a reasonable relation to the cost of the work in the contract, holistically" because the "line items were not balanced"[18] and CLIN 0001

---

[17] We are not sure why the contract award amount was slightly different that the $1,699,864 shown on the abstract of bids (finding 7).

[18] When it benefited the COE to defend the unbalanced bid, it did so in response to the protest (finding 9) to capture NALCO's low price. However, after award the

38

included costs that should have been in CLINs 0002 to 0004 for dredged material. (Finding 21) We do not know what she meant by "holistically." We do not know what the unbalanced bid has to do with this test. The contract did not inform bidders they could only recover equipment/performance costs in CLINs 0002 to 0004. CO Kidd clarified her reasoning stating that the equipment costs in CLIN 0001 "are not costs that may be attributed to mobilization" and "not inherently associated with mobilization." (Finding 25) Therefore, CO Kidd's interpreted "work" to be limited to the actual costs of moving equipment to the work site and other non-performance related costs, i.e., not costs for the dredge, pipe, etc. Her test was therefore, that $874,226.40 did not bear a reasonable relationship to the actual cost of transportation and other non-performance related costs which she valued at $101,102.70. We find that this interpretation, although not the best in our opinion, is within the "zone of reasonableness." Having two reasonable interpretations, the language "do not bear a reasonable relation to the cost of the work in this contract" is ambiguous as a matter of law.

The next step in the interpretation analysis is to use parole/extrinsic evidence to clear up the ambiguity. *Teg-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329 at 1338-39 (Fed. Cir. 2006) (Although the parol evidence rule bars the use of extrinsic evidence to supplement or modify a written agreement, the rule does not bar the use of extrinsic evidence to interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself.). There is no extrinsic evidence in the record to assist us in ascertaining what the drafters of the criteria in paragraph (b) had in mind. The next step is to consider the ambiguity and duty to inquire. If an ambiguity is patent a duty to inquire arises. *NVT Technologies v. United States,* 370 F.3d 1153 at 1162 (Fed. Cir. 2004) (If the ambiguity is patent, it triggers a duty to inquire. A patent ambiguity is one that is "obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start."). The ambiguity in this case is the language of DFARS 252.236-7004(b), one of many clauses incorporated into the contract. We find that this ambiguity was not patent and NALCO was not obligated to inquire. This leads us to the final step. The government wrote DFARS 252.236-7004(b) and we interpret paragraph (b) against the government under *contra proferentem*:

> If the ambiguity is not patent, but latent, we construe it
> against the drafter under the rule of *contra proferentem.*
> *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751
> (Fed. Cir. 1999). For the rule to apply, however, the
> nondrafting party must prove that it relied on its
> interpretation during bidding. *Fruin-Colnon Corp. v.*
> *United States,* 912 F.2d 1426, 1430 (Fed. Cir. 1990).

---

COE uses the unbalanced bid as justification to refuse to pay NALCO its CLIN 0001 mobilization price (finding 23).

*Weis Builders, Inc.*, ASBCA No. 56306, 10-1 BCA ¶ 34,369 at 169,722. It is clear from NALCO's bid that it relied upon its interpretation of CLIN 0001 "mobilization" of its "plant and equipment" to allow for partial reimbursement for its equipment (dredge, pipe, etc.) needed to perform the contract (findings 7, 14). This is the interpretation we will enforce. We will not enforce CO Kidd's interpretation that CLIN 0001 only allows for transportation costs and not equipment costs based on *contra proferentem*. Therefore, CO Kidd's decision violated element (3) in that her discretion was limited and element (4) in that she violated a regulation, which is DFARS 252.236-7004(b).

There are other independent facts supporting our conclusion that CO Kidd abused her discretion in invoking paragraph (b). Before award in defending the protest she recognized NALCO's bid was unbalanced and decided to implement (b) knowing NALCO's performance costs were in CLIN 0001. (Finding 9) She testified "you can't even fuel a dredge for this work at the cost [$2.50] of the line item for the quantities"[19] (finding 21). This testimony proves that CO Kidd knew that NALCO could not possibly pay for its costs of performance through the per cubic yard prices in CLINs 0002 to 0004. She knew that NALCO had frontloaded its equipment/performance costs in CLIN 0001. (Findings 23, 25) Nowhere in the solicitation are the bidders warned that only actual transportation and related costs would be paid for in CLIN 0001 and that bidders must recover all other costs needed to perform the contract in CLINs 0002 to 0004 unit prices for each cubic yard of dredged material. The total amount approved by CO Kidd for mobilization was $101,102.70 reserving $773,123.70 for payment only when performance was complete. (Finding 25) CO Kidd knew NALCO needed this money to perform. She also knew that the COE's insistence that NALCO offer a larger dredge at no additional cost would increase NALCO's cost of performance thereby adversely affecting cash flow. She further justified her decision by testifying that if the COE paid for the dredge and other equipment up front "there was no reason for the contractor to continue performance once they had the money because there is no money on the line items [for dredged material]." (Finding 26) It is astonishing to us that the COE would enter into this contract assuming that NALCO would not perform if it were paid 60% of its CLIN 0001 bid mobilization price as authorized by paragraph (a). In response to NALCO's plea for payment (finding 24), CO Kidd wrote, "It is not the practice of the U.S. Army Corps of Engineers to counsel contractors on their cash flow concerns or provide financing to contractors who experience cash flow problems" (finding 25). This shows a degree of callousness unexpected from the government since the government caused NALCO's cash flow crisis. When asked by the trial judge how NALCO was supposed to pay for performance, CO Kidd testified that NALCO would have to get private financing and that the way NALCO structured its bid caused the cash flow problem (finding 26). Again this is proof that the CO Kidd understood that

---

[19] The COE's dredging expert, Mr. Bullock, agreed that NALCO could not operate its equipment at a per cubic yard price on $2.50 (finding 81).

40

NALCO front-loaded its performance costs in CLIN 0001. The judge suggested it was CO Kidd's decision to exercise paragraph (b) that caused NALCO's cash flow problem (*id.*). CO Kidd responded that there was already risk (*id.*). While these facts arguably do not support a finding of "subjective bad faith," they provide further support for our finding of abuse of discretion because CO Kidd knew that invoking paragraph (b) would cause NALCO severe cash flow problems. In fact, CO Kidd knew all of this before award in defending the protest but was focused on capturing NALCO's low bid and protecting the COE rather than focusing on successful performance. (Findings 7, 9) Arguably, CO Kidd should have taken this knowledge and decided not to award to NALCO because its bid violated her interpretation of the clause.

For the reasons discussed above we find that CO Kidd abused her discretion when she invoked DFARS 252.236-7004(b).

*The COE Breached the Implied Duty of Good Faith & Fair Dealing/Non-Interference*

Previously we dealt with the implied duty of good faith and fair dealing in *Raytheon Missile Systems Co.*, ASBCA No. 57594, 13 BCA ¶ 35,264. We followed the Federal Circuit's guidance in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010), that required a determination that the government's action: (1) was "specifically targeted" at the contractor, and (2) "reappropriated" a benefit guaranteed by the contract to the contractor. *Raytheon*, 13 BCA ¶ 35,264 at 173,116. The Federal Circuit clarified *Precision Pine* in *Metcalf Construction Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014). The Court began with the general principle:

> "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement (Second) of Contracts § 205 (1981) ("Restatement"), quoted in *Alabama v. North Carolina*, 560 U.S. 330, 130 S. Ct. 2295, 2312, 176 L. Ed. 2d 1070 (2010). Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty "imposed by a promise stated in the agreement." Restatement § 235. We have long applied those principles to contracts with the federal government. *E.g., Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010); *Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988).

*Metcalf*, 742 F.3d at 990. The Court then explained that the lower court's decision misread *Precision Pine*:

The trial court's decision in this case rests on an unduly narrow view of the duty of good faith and fair dealing. Relying almost entirely on *Precision Pine*, it held that "a breach of the duty of good faith and fair dealing claim against the Government can *only* be established by a showing that it "specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract."

....

The trial court misread *Precision Pine*, which does not impose a specific-targeting requirement applicable across the board or in this case. The cited portion of *Precision Pine* does not purport to define the scope of good-faith-and-fair-dealing claims for all cases, let alone alter earlier standards.

*Id.* at 992-93. Accordingly, we no longer need to find "specific targeting" or "reappropriation" of benefits to establish a breach of the implied duty of good faith and fair dealing. The Federal Circuit directs us to follow "the familiar broader standards reflected in the passages from *Centex* [*Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005)]; and *Malone* [*v. United States*, 849 F.2d 1441 (Fed. Cir. 1988)]." *Metcalf*, 742 F.3d at 994. *Centex* provides, "The covenant of good faith and fair dealing...imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex*, 395 F.3d at 1304. We follow *Centex* and *Malone*.

In applying this guidance, we cannot ignore the COE's disturbing attitude toward NALCO as seen in the record. Before award there was the improper direction to use a bigger dredge at no additional cost or have its bid rejected (finding 10). This increased NALCO's equipment costs and reduced the cash flow available to pay for such things as labor, gas, survey support, overhead and profit. When the NTP was issued on 12 December 2013, Messrs. O'Donnell, Walsh, Morocco and Stearns joked that NALCO needed "babysitting" and that the dredge might sink[20] (finding 16). On 27 January 2014 Mr. Kim told Mr. Stearns that if he didn't get the 60% of his mobilization bid price NALCO could not perform and would go bankrupt to no avail (finding 23). On 28 January 2014, Mr. Kim submitted a seven-page memorandum to

---

[20] Innocuous standing alone but not under the circumstances of this appeal.

42

the COE arguing that NALCO should be paid for its mobilization costs as bid (finding 24). The memorandum was dismissed by the COE as evidenced by Mr. Dolan's 28 January 2014 internal email mocking NALCO's 28 January 2014 memorandum (*id.*). This memorandum contained a number of completely valid arguments that if taken seriously may have avoided the destruction of NALCO and this litigation (*id.*). Then there is CO Kidd's belief that NALCO would not perform if she paid the 60% of its CLIN 0001 price which was clearly authorized in DFARS 252.236-7004(a) (finding 26). When Mr. Kim informed Mr. Stearns that the revetment in the disposal area was a problem, Mr. Kim recalled Mr. Stearns saying the COE didn't care if NALCO finished, they were just following procedures[21] (finding 20). CO Kidd attributed NALCO's problems with the revetment to its "incompetence" and "mismanagement of the disposal" (finding 41), when the revetment clearly was a change that encroached on NALCO's disposal area and interfered in its dredging (findings 36, 41). Mr. Walsh testified on the revetment that a "changed site condition like that is problematic after you've awarded" a contract (finding 13). There is also the way Mr. Kim was coerced into signing Modification No. P00003 to avoid CO Kidd's threat to terminate for default if he did not accept her take-it-or-leave-it offer of $375,000,[22] a threat she had no right to make because NALCO was not in default (*see* decision below). CO Kidd wrote the 28 October 2014 Hazlett letter to Mr. Kim stating in part:

> The goal of the Corps in this matter was to provide you with the resources necessary to complete the project while limiting risk to the government....
>
> ....
>
> ...The Corps is committed to partnering with our small business community to meet our mission requirements. However, after review, it appears that our New England District acted in good faith in awarding and administering this contract and also took extra measures to limit financial damage to your company while acting within the bounds of the law and the best interests of the government.

(Finding 69) Nothing could be further from the truth. CO Kidd drafted this letter (*id.*). The COE certainly did not partner with NALCO or attempt in any way to provide NALCO "resources necessary to complete the project" or "limit financial damage." As a result of the COE's actions, Mr. Kim lost his home, equipment and

---

[21] Mr. Kim's testimony is unrebutted in the record and we find it credible.

[22] This amount is much less that estimates from other COE personnel that valued the settlement at $600,000 or $700,000 (findings 46, 55).

business. (Finding 32) Even with all the harm that the COE caused NALCO, it performed well (findings 44-45). When presented with evidence of the validity of NALCO's claims, COE senior management failed to act to remedy the problems (finding 71). These examples are not merely anecdotal. At every point where an important decision had to be made, the COE chose to protect itself rather than act to successfully complete the contract or redress NALCO's legitimate claims.

To be fair, there were a few in the COE who seemed to sense the predicament NALCO faced. Mr. Walsh testified the revetment was a changed site condition (finding 13). In March 2014 Mr. Walsh understood that asking NALCO to provide for access for PNCC to place sand over the revetment was an unreasonable imposition on NALCO and a change to the contract (finding 39). Mr. O'Connor's 6 March 2014 email to Mr. Walsh suggested that NALCO should be paid about $200,000 for performance. Also in March 2014 Mr. Walsh wrote that NALCO should be paid something "the sooner the better considering their cash-flow problems." (Finding 34) In March 2014 Mr. O'Connor recognized that paying NALCO 15% of the contract amount for 59% of the work until settlement was unfair (finding 34). He also wrote, "The unofficial COE survey shows NALCO['s] work was very good considering they had no [could not afford] survey work" (finding 44). In April 2014 email Mr. Walsh wrote that NALCO "approached this project with integrity and a good faith effort to meet their obligations under this contract" (*id.*). In April 2014 Mr. O'Connor suggested settlement in the $740,000 to $790,000 range (finding 46). In May 2014 ACO Morocco informed CO Kidd that Mr. O'Connor's settlement estimate was in the $600,000 range (finding 55). In June 2014 Mr. O'Connor emailed Mr. Walsh stating that NALCO had still not been paid for the majority of the work performed (finding 57). Unfortunately these voices of reason fell on deaf ears. In December 2014, Mr. Cashman's memorandum to Mr. Hazlett recognized weaknesses in the COE's position and recommended reopening the negotiations, nothing happened (finding 71). Also in December 2014 Ms. Fontana recognized that NALCO was entitled to relief but her arguments were not acted upon (finding 72).

The COE breached the implied duty of good faith and fair dealing/non-interference generally based on its treatment of NALCO discussed above. We held above that invoking DFARS 252.236-7004(b) was an abuse of discretion. This in turn interfered with NALCO by limiting the CLIN 0001 payment to $101,102.70 rather than $874,226.40 improperly denying NALCO $773,123.70 it needed to perform the contract (finding 23). The interference was exacerbated by the COE's improper pre-award insistence that NALCO offer a larger more expensive dredge at the same bid price (finding 10). The drastic reduction in cash flow destroyed NALCO's reasonable expectations regarding the "fruits of the contract" i.e., being able to perform and be paid for completion of the contract. *Centex*, 395 F.3d at 1304. This constitutes a breach of the implied covenant of good faith, fair dealing and non-interference.

44

*The Rock Revetment is a Constructive Change*

The solicitation/contract required NALCO to place dredged material on the western beach starting from Ferry Rock to the north then south along the beach adjacent to the PNCC and beyond (findings 4, 15). The solicitation/contract drawings of the disposal area did not show the new rock revetment or otherwise disclose that PNCC planned to construct a rock revetment at the northern end of the disposal area where NALCO was to start disposing of dredged material (finding 17).

The day after the contract was awarded, the COE learned that PNCC was going to construct a rock revetment along the western beach disposal area adjacent to and seaward of PNCC's property (finding 13). Minutes from a 17 December 2013 coordination meeting indicate that the revetment was discussed. Mr. Kim expressed concern over the revetment but was told by Mr. Walsh to continue work "as is" and that the COE would "resolve this problem" (finding 17). No resolution of the "problem" by the COE was forthcoming.

Mr. Kim asked if the revetment could be postponed until after NALCO had completed dredging (finding 20). The revetment was not postponed and was completed by 7 February 2014, just before NALCO started dredging (finding 28). Mr. Kim and his son Mr. Paul Kim, the dredge operator, testified about the adverse effect the revetment had on dredging. The revetment encroached on the beach making it narrower reducing NALCO's work area. To avoid undermining the revetment and causing it to collapse,[23] NALCO had to work at low tide which caused a "large degree of stop and starts of the dredge." (Finding 28) This testimony is corroborated by ACO Morocco's 11 March 2014 email, written when NALCO was still working at the revetment, stating that NALCO "has a lot of stop and start due to waiting for the tide, putting out pipe, then dredging if the tides allow. It was very inefficient." (Finding 37) The Kims' testimony is also corroborated by photographs taken in March 2014 (finding 47). The Kims' testimony is also corroborated by the daily quality control reports (finding 48). Mr. Kim testified that NALCO could "fly through the work" if the revetment had not been there[24] (finding 36). The COE, however, attributed NALCO's problems to its "incompetence" and "mismanagement of the disposal" not the revetment (finding 41). The COE's position is not supported by the record. We find Mr. Kim's and Mr. Paul Kim's testimony, corroborated by contemporaneous documents and photographs, is credible and we find that the

---

[23] NALCO's dredging expert, Mr. Pena, agreed that the presence of the revetment forced NALCO to protect it from "scouring" by the "jet" of the slurry (finding 77).

[24] Mr. Pena agreed that once NALCO progressed past the revetment, it could resume normal operations with greater efficiency (finding 78).

revetment significantly interfered with NALCO's ability to make progress in its dredging work.

Having held that the revetment interfered with NALCO's ability to perform, we consider if this was a constructive change:[25]

> A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order under the Changes provision of the contract, due either to an informal order from, or through the fault of, the government. If the CO or other authorized person, without issuing a formal change order, requires the contractor to perform work or to utilize materials which the contractor regards as being beyond the requirements of the pertinent contract specifications or drawings, the contractor may elect to treat the CO's directive as a constructive change order and prosecute a claim for an equitable adjustment.

*Lamb Engineering & Construction Co.*, ASBCA No. 53304 *et al.*, 06-1 BCA ¶ 33,178 at 164,417 (citations omitted).

The first time the revetment was discussed with NALCO was at the 17 December 2013 coordination meeting when Mr. Walsh, COE project engineer, told Mr. Kim to "continue to work as is, and [he did] not see any problems with this [the revetment] and that USACE would resolve this issue." Mr. Stearns, COE project manager, was present at the meeting. (Finding 17) Mr. Walsh and Mr. Stearns were not contracting officers, however, as project engineer and project manager we find that based on their positions they had implied actual authority to direct NALCO's work. *Catel, Inc.*, ASBCA No. 54627, 05-1 BCA ¶ 32,966 at 163,298 ("Under appropriate circumstances. an implied-in-fact contract may arise where a government representative without express contracting authority has implied actual authority to bind the government. Such authority must be 'an integral part of the duties assigned to the Government employee who created the obligation.'").

If we were to find that Mr. Walsh's and Mr. Stearn's direction to NALCO was somehow unauthorized, we would find ratification. ACO Morocco knew about the

---

[25] FAR 52.236-2, Differing Site Conditions, identifies two types of conditions. First, subsurface or latent physical conditions which differ materially from those indicated in the contract. Second, unknown physical conditions at the site of an unusual nature which differ materially from those ordinarily encountered. We do not view the revetment as a differing site condition because it did not exist before contract award.

46

revetment on 16 January 2014 (finding 20). On 22 January 2014, CO Kidd was informed of NALCO's problems (finding 22). They had actual knowledge that NALCO would have to deal with the previously undisclosed revetment located in the disposal area and that Mr. Walsh and Mr. Stearns were monitoring NALCO's work. We find CO Kidd and ACO Morocco adopted the actions of Mr. Walsh and Mr. Stearns and therefore ratified their actions both at the 17 December 2013 meeting and thereafter. *Catel*, 05-1 BCA ¶ 32,966 at 163,298 (A government representative with contract authority, who has actual or constructive knowledge of the material facts with respect to an unauthorized contract action by a government representative, may ratify the action so as to bind the government provided the authorized representative expressly or by implication adopts the unauthorized contract action.); *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (Ratification requires knowledge of material facts involving the unauthorized act and approval of the activity by one with authority.). The additional work caused by the revetment was not work required under the contract. We find that NALCO did not volunteer to deal with the significant added difficulties caused by the revetment and that the COE directed NALCO to protect the revetment without additional compensation. The revetment was a constructive change to NALCO's contract. NALCO was and is entitled to an equitable adjustment for increased costs and time to perform caused by the revetment. *Lamb Engineering*, 06-1 BCA ¶ 33,178 at 164,417.

*The Modification No. P00003 Release is Unenforceable*

We have found that the CO Kidd's decision to invoke DFARS 252.236-7004(b) was an abuse of discretion. This breach deprived NALCO of cash flow needed to perform the contract. Consequently, we found that the COE breached the implied duty of good faith, fair dealing and non-interference. Therefore, NALCO's failure to perform due to financial difficulties is excusable. *Cantrill Development Corp.*, ASBCA No. 30160 *et al.*, 89-2 BCA ¶ 21,635 at 108,850 ("If CDC's financial incapacity was Government caused the resulting inability to perform would be due to a cause not within the contractor's control or due to its fault or negligence and thus would be excused."). We then found that the construction of the rock revetment by PNCC was a constructive change that entitled NALCO to an equitable adjustment to both cost and time to perform. For these reasons NALCO's failure to complete by 31 March 2014[26] was excusable and NALCO was not in default. CO Kidd had no right to terminate for default and therefore no right to threaten to terminate for default. Such threats can be coercive. *Milton Beatty v. United States*, 168 F. Supp. 204, 207 (A party is always entitled to say that if his offer is not accepted, he will avail himself of his legal rights; it is only the threat of a wrongful or unlawful act that may constitute

---

[26] NALCO asked CO Kidd for a time extension because it believed having passed the revetment, it could finish the contract (findings 40-41). An extension was not granted.

47

duress. Such a threat will amount to duress only if it is sufficient to overpower the will of the other party and prevent the free exercise of his will.); *B&H Construction Co.*, ASBCA Nos. 24558, 24587, 80-2 BCA ¶ 14,568 at 71,840 (citations omitted):

> The coercion of which appellant complains in each instance was the threat by the contracting officer to terminate the contract for default. We must therefore determine whether the contracting officer would have been justified in terminating the respective contracts for default at the time of making the threats, since it is not coercion, or duress, for a party to do or threaten to do what it has a legal right to do....
>
> In the matters before us, the propriety of the Government's threats to terminate for default hinges upon whether the delays arose from unforeseeable causes beyond the control and without the fault and negligence of appellant and its subcontractors and suppliers *at any tier*.

We now consider if CO Kidd's threats to terminate NALCO for default amount to duress. In *Freedom NY, Inc.*, ASBCA No. 43965, 04-2 BCA ¶ 32,775, we considered duress:

> To render a contract unenforceable for duress, the party "must establish that (1) it involuntarily accepted [the other party's] terms, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of [the other party's] coercive acts." *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d at 1329, quoting *Dureiko v. United States*, 209 F.3d 1345, 1358 (Fed. Cir. 2000). "[C]oercion requires a showing that the government's action was wrongful—*i.e.* that it was (1) illegal, (2) a breach of an express provision of the contract without a good faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing." *Id*. at 1330.

*Id.* at 162,066. We follow this guidance.

We look at the events leading up to the 1 August 2014 negotiations and Mr. Kim's signing Modification No. P00003 on 12 August 2014. On 23 April 2014 Mr. O'Connor suggested to CO Kidd that a settlement with NALCO "might be

$740,000 to $790,000." CO Kidd responded saying his analysis was "spot on." (Finding 46)

CO Kidd suggested negotiation of a settlement as an alternative to termination for default (finding 49). On 1 May 2014, CO Kidd wrote NALCO presenting three "options" (previously discussed): (1) T4D – Surety tenders payment for payment bond, (2) T4D – Surety takes over, or (3) No-cost settlement[27] as a T4D alternative (finding 52). CO Kidd also took the position that the COE would not include equipment costs, i.e., dredge, pipe, etc. or costs arising from the "differing site condition" (revetment) in the settlement (finding 49).

On 30 April 2014 CO Kidd discussed settlement with NALCO's attorney. CO Kidd reiterated her position that she would not consider costs for the dredge, pipe and differing site condition. On 7 May 2014 CO Kidd met with NALCO's attorney and agreed to pursue settlement. Mr. Kim testified that at the time he felt he had no choice but to agree to what CO Kidd offered. (Findings 52-53)

Before meeting with CO Kidd, NALCO submitted a settlement proposal in the amount of $1,023,898 that included costs for the dredge, pipe, miscellaneous equipment, payroll, overhead, demobilization, and differing site conditions (finding 58). The parties met on 1 August 2014 to discuss settlement. The COE initially offered $350,000 and raised it to $375,000 when NALCO would not accept the first offer. CO Kidd told NALCO's lawyer that $375,000 was take it or leave it and if NALCO did not take it she would terminate the contract for default. (Finding 61) Mr. Kim understood that if the contract was terminated for default he would get no money and the bonding company would auction off his property such as his personal house and NALCO's equipment. Mr. Kim decided to call an SBA ombudsman. Mr. Kim testified that the ombudsman told him the COE was trying to force NALCO into bankruptcy and that if he didn't take the money offered he would lose his house. She suggested that he could go to court and that a judge might help him. Mr. Kim went back into the meeting with CO Kidd and signed the offer. (Finding 61) He testified it was a "take it or leave it" situation. CO Kidd knew that Mr. Kim was not happy with the settlement. Mr. Kim told her he felt forced into the agreement. (Findings 61, 63) The 1 August 2014 agreement was formally implemented in Modification No. P00003 submitted to NALCO after the meeting. Before Mr. Kim signed Modification No. P00003, he complained to the COE IG and Mr. Hazlett, COE director of contracting, stating that the $375,000 was unfair because it did not include anything for the dredge, pipe and differing site conditions. (Finding 62) On 12 August 2014 Mr. Kim signed Modification No. P00003

---

[27] This is a misnomer because Modification No. P00003 included a payment (finding 63)

implementing the settlement, however, the COE held back $1,000[28] (finding 63). On 26 August 2014 NALCO was paid $374,000 (finding 68). Mr. Kim testified that he signed under protest and did not agree with the content of the modification but signed to get the money (finding 61). Based on this record we find that NALCO involuntarily accepted the COE's terms. We also find that because NALCO was effectively out of business (finding 65), and Mr. Kim's personal house, and NALCO's equipment was about to be sold to pay creditors (findings 32, 61), Mr. Kim had no other alternative but to accept the COE's terms.

Finally we must consider if the COE's actions were coercive, i.e. (1) illegal, (2) a breach of an express provision of the contract without a good faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing. *Freedom*, 04-2 BCA ¶ 32,775 at 162,066. We start with illegal act; we do not consider CO Kidd's actions to be illegal.

The default clause in NALCO's contract is FAR 52.249-10, Default (Fixed-Price Construction) (finding 3). It provides that a contractor's right to proceed "shall not be terminated" if the "delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor." We found that CO Kidd had no right to threaten NALCO with termination for default—a violation of the Disputes clause. So the question becomes did CO Kidd have a "good faith belief that the action was permissible under the contract"? CO Kidd explained that she and "her team" believed termination for default was justified, "The revetment had very little to do with the failure; it was the mismanagement and incompetence, not only in the disposal, but also in the dredging itself." (Finding 60) We do not accept this as a good faith position. CO Kidd ignored the fact that the revetment reduced the space on the beach NALCO had to work. NALCO had to work at low tide to avoid damaging the revetment. (Finding 28) Mr. O'Connor's 11 March 2014 email, written at the time NALCO was working near the revetment, informing CO Kidd that NALCO was experiencing "a lot of stop and start due to waiting for the tide" and was very inefficient, contradicts CO Kidd's position (finding 37). The record is replete with evidence that NALCO's failure to perform was excusable. We find CO Kidd violated an express provision of the contract, the Default clause, without a good faith belief that the action was permissible under the contract.

We found that the COE improperly invoked DFARS 252.236-7004(b) depriving NALCO of significant cash flow thereby breaching the implied covenant of good faith and fair dealing. We found that CO Kidd did not have the right to threaten NALCO with termination for default. Therefore, we find that CO Kidd's take it or leave it price

---

[28] Because we find coercion we need not consider the issue of consideration for the modification and release.

50

of $375,000 and threat to terminate NALCO for default if Mr. Kim did not agree to that price was another breach of the implied covenant.

Having found two of the three indicia of coercion, we find that NALCO was coerced into signing Modification No. P00003 and its release is unenforceable.

## CONCLUSION

ASBCA No. 60235—Contract Balance and Recession, Repudiation of Settlement Agreement for Duress. We found that the COE coerced Mr. Kim into signing the deal embodied in Modification No. P00003 and therefore the modification and its releases are unenforceable. Additionally, we found that under these circumstances the implementation of DFARS 252.236-7004(b) was a violation of the implied covenant of good faith and fair dealing. ASBCA No. 60235 is sustained, however, the exact amount NALCO is entitled to is left to quantum to be determined in accordance with this decision and the terms of the contract.

ASBCA No. 60236—Unabsorbed Overhead. The only factual support for this claim is proposed finding 302. That finding cites to Mr. Kim's testimony that identified some continuing expenses and ends with, "NALCO remains in standby mode pending resolution of this claim." We disagree. The project has been completed and there is no prospect that NALCO will be called upon to continue dredging on the project. ASBCA No. 60236 is denied.

ASBCA No. 60237—Differing Site Conditions. There are two alleged differing site conditions in NALCO's claim; first is the material NALCO was dredging. No evidence was presented on the differing dredge material claim; NALCO failed to meet its burden of proof. Additionally, NALCO withdrew the dredged material part of its claim (appellant's proposed conclusions of law, at 7 n.1). That portion of ASBCA No. 60237 is denied. The second alleged differing site condition is the revetment. We found that building the revetment after contract award interfered with NALCO's dredging work and was a constructive change. The PNCC revetment portion of ASBCA No. 60237 is sustained, however, the amount NALCO is entitled to is left to quantum.

ASBCA No. 60238—Time Extension. We found that the COE breached the implied duty of good faith and fair dealing by improperly imposing DFARS 252.236-7004(b) that deprived NALCO of mobilization funding needed to perform the contract. We found that the revetment was a constructive change entitling NALCO to both compensation and a time extension. However, in its brief NALCO concedes that its request for a time extension is "moot in light the reprocurement work." We sustain ASBCA No. 60238, but there is no independent quantum aspect to this claim.

51

For the reasons stated above, the appeal is sustained in part and remanded to the parties to determine quantum. CDA interest shall be paid from 19 February 2015.

Dated: 9 August 2018

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result (see separate opinion)

I concur in result (and join Judge Prouty's opinion)

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

## OPINION BY JUDGE PROUTY CONCURRING IN RESULT

We concur in the result, but not in some of the reasoning followed by Judge Clarke. In particular, we agree with Judge Clarke's findings that the presence of the revetment at the disposal location constituted a constructive change to the contract for which the government is liable for proven damages and which would preclude any termination for default of NALCO on the grounds of its failure to complete the contract on time. We also agree with Judge Clarke's findings that the release executed by NALCO was made under economic duress and is thus void (we do so, however, without agreeing that there was necessarily a breach of the duty of good faith and fair dealing). The consequence of these findings is that NALCO is entitled to termination for convenience damages: the whole of CLIN 0001 (mobilization and demobilization); the work done on the other CLINs; and the extra costs incurred through the constructive change. This is the entirety of what Judge Clarke awards.

We part company with Judge Clarke on two matters that need not be reached to obtain his result, namely, the finding that the CO actionably abused her discretion by exercising the right to defer paying certain mobilization costs, and the finding of the breach of the duty of good faith and fair dealing. With respect to the contract clause that the CO utilized to avoid early payment of NALCO's mobilization costs, Defense Federal Acquisition Regulation Supplement (DFARS) 252.236-7004(b) (the DFARS clause), two things prevent us from joining Judge Clarke's opinion: first, the terms of this contract provision insulate it from review; second, it is not so clear to us that the CO applied the provision improperly.

The DFARS clause, set forth in Judge Clarke's opinion, above, provides, in section (b), that the CO:

> [M]ay require the Contractor to furnish cost data to justify [the mobilization/demobilization] portion of the bid if the [CO] believes that the percentages in paragraphs (a)(1) and (2) of this clause do not bear a reasonable relation to the cost of the work in this contract.

Subsection (b)(1) of the DFARS provision allows the CO to pay only "actual" mobilization and demobilization costs, as determined by the CO, if the contractor "[f]ail[s] to justify such price to the satisfaction of" the CO. Next, subsection (b)(2) of the DFARS clause provides that "[t]he Contracting Officer's determination of the actual costs in subparagraph (b)(1) of this clause is not subject to appeal."

Judge Clarke has determined that the CO here abused her discretion by invoking section (b) of the DFARS clause (he does not contend a violation of subsection (b)(1)). But section (b) is only about requiring the contractor to furnish cost data in the

53

circumstances where the CO "believes" that the mobilization and demobilization CLINs did not bear a "reasonable relation" to the contract's costs. The CO's requiring the provision of cost data by NALCO is not how NALCO was (or alleged it was) harmed. NALCO was hurt by the CO's decision, pursuant to subsection (b)(1), to only pay "actual" mobilization costs. That determination—actually, the determination of what the actual mobilization costs should be, which is effectively the same thing in these circumstances—is insulated from review by subsection (b)(2) of the DFARS clause, thus we should not decide it and should end our inquiry. We note that subsection (b)(1)(iii) of the clause provides that any money agreed to be paid for the mobilization/demobilization CLIN that was not paid at the time of mobilization or demobilization will be paid at the time of the final payment on the contract. In other words, the CO's unappealable discretion here is not about whether to pay NALCO the amount set forth under the mobilization/demobilization CLIN, but about exactly when to pay the full amount.

Were we to, nevertheless, find that we could review the CO's exercise of discretion under the DFARS clause, we would not conclude that it was unreasonable. Judge Clarke's basis for determining this exercise to be unreasonable is his view that the CO's belief that the mobilization/demobilization amounts in the CLIN "did not bear a reasonable relation to the cost of the work in this contract" was simply wrong. To that end, he essentially found that any amount of mobilization/demobilization costs that was less than the total contract price would bear a "reasonable relation" to the cost of work in the contract. We find this to be an untenable interpretation of the DFARS clause's terms.

It is well established that to interpret a contract, the Board should read it "as a whole and interpreted to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless, or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922; *see also Hunkin Conkey Constr. Co. v. United States*, 461 F.2d 1270 (Ct. Cl. 1972) (rejecting contract interpretation that would render another clause in the contract meaningless). If "reasonable relation" meant that the cost of the CLIN were simply less than or equal to the cost of the entire contract, as Judge Clarke appears to imply, it would render the entire DFARS clause meaningless, because, as a matter of mathematics, in the absence of negative payments, all CLINs are less than or equal to the entirety of the contract price. Thus, as a matter of contract interpretation, the phrase must mean more than Judge Clarke is allowing. The most reasonable interpretation we can read into it is that, in the CO's judgment, the mobilization/demobilization costs not be too disproportionately large a part of the contract's costs.

The DFARS clause does not explain what exactly constitutes an overly large proportion of mobilization/demobilization costs, but leaves it to the discretion of the CO, which is consistent with the general scheme implemented by the DFARS clause:

nominally, the mobilization/demobilization CLIN is paid 60-40 at the completion of mobilization and the completion of demobilization; but if the CO believes that the numbers are too disproportionate, she may ask for more backup on actual costs;[29] after she receives that backup and analyzes it, she may decide what to pay prior to contract completion. Thus, though the term is somewhat vague, it is not impermissibly so in this context, and certainly cannot be read to forbid what the CO did.

Judge Clarke also argues that "other independent facts" support his conclusion that the CO abused her discretion by invoking the DFARS clause. Generally, we understand Judge Clarke's concerns to be that the CO knew that limiting up-front payments to NALCO through the DFARS clause would have serious cash flow implications upon the company, and that the solicitation would not have given NALCO any reason to expect that only a portion of the costs would be paid up-front. Judge Clarke concedes, however, that these facts do not prove subjective bad faith on the part of the CO.

In the absence of subjective bad faith and inasmuch as it was consistent with the contract, we do not find that these extra reasons make the CO's actions into an abuse of discretion as we define the term in *Raytheon Co.*, ASBCA No. 57743 *et al.*, 17-1 BCA ¶ 36,724 at 178,845, which was cited by Judge Clarke. To be sure, we are not happy with the way the Corps acted on this issue: it was irresponsible, to say the least, of the Corps to make this contract award knowing full well how imbalanced the CLINs were, but NALCO also chose to make an unbalanced bid and to agree to the more expensive dredger. The DFARS clause was not a secret, and did put NALCO on notice that it might not receive the entirety of its mobilization/demobilization costs at the beginning of performance. Moreover, the relatively short time frame for performance here (five months) was such that it was not impossible for NALCO to perform without a government pre-payment (and, indeed, NALCO did so).

Similarly, like Judge Clarke, we find the government's general behavior throughout the award and performance of the contract to be abhorrent. Nevertheless, for reasons having nothing to do with the good faith of the government, we find it inappropriate to apply the implicit doctrine of good faith and fair dealing as Judge Clarke does.

---

[29] The Federal Acquisition Regulation (FAR) has, on other occasions, permitted a CO's suspicions to trigger a requirement that a contractor provide more substantiation for certain costs. For example, in FAR 31.201-3, all that is necessary to impose upon a contractor the burden of proof of demonstrating a particular cost to be reasonable is the CO's "challenge" of that cost after "an initial review of the facts." FAR 31.201-3(a). Like the DFARS clause we have discussed above, this FAR provision does not go into detail about what is sufficient for the CO to bring such a challenge.

55

Primarily, we decline to apply the doctrine because it requires more than the government act badly; it does not apply when the contract otherwise addresses the action complained of, and, like any breach, it must lead to damages. *See Relyant, LLC*, ASBCA No. 59809, 2018 WL 3387700 (good faith and fair dealing does not expand duties beyond those explicitly set forth in contract, but addresses circumstances not specifically set forth by the contract). Judge Clarke finds a breach of the duty by the government "generally based on its treatment of NALCO discussed above." But general bad treatment, obnoxious though it may be (and it truly is here), is not enough for a cause of action – it must lead to some tangible damage. Judge Clarke does allege that the CO's exercise of the DFARS clause is one instance of a particular action that breached the duty of good faith and fair dealing. We have addressed this above, however: by the contract's terms, it is effectively not reviewable; moreover, the CO appears to have acted within her broad discretion in delaying payment of the CLIN.

We underscore that we join Judge Clarke's general condemnation of the means by which the government administered this contract. And we find that the government breached the contract through the constructive change and that the release it secured from NALCO was obtained through duress. Had the government acted reasonably throughout, and treated NALCO fairly, it is highly likely that it could have obtained a properly enforceable release that would have far better served both its purposes and NALCO's than the results of this litigation will. Thus, though the government is technically absolved of one cause of action, it is no victory and the results are the same.

In all other respects, we concur with Judge Clarke's opinion.

Dated: 9 August 2018

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60235, 60236, 60237, 60238, Appeals of North American Landscaping, Construction and Dredge, Co., Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals